Plaintiff operates a grain elevator at York, this state; the defendant farms near that place. In November, 1920, the defendant came into a bank at York; he there found one Van Slyk and the plaintiff engaged in conversation. Van Slyk, in plaintiff's presence, told defendant that he had purchased 2,000 bushels of wheat on the Minneapolis Chamber of Commerce and asked him if he would not go into the deal on the basis of fifty per cent. To this the defendant agreed. Later defendant and Van Slyk purchased 5,000 bushels of oats under the same arrangement. The plaintiff wrote the telegrams to the commission firm ordering the oats. Later the defendant asked plaintiff to purchase 1,000 bushels of oats for him. This was done. Plaintiff says that he wrote the telegrams when all these deals were made and guaranteed the accounts. The business was handled this way, he says, because he had an account and credit with the commission house and it was, therefore, not necessary to make any cash payment. A loss having resulted, defendant later executed negotiable paper to the plaintiff to cover the balance, about $1,400 having been paid. The plaintiff sued on the note, recovered judgment, and the defendant appeals.
The defendant resists payment on the theory that the consideration for the note was losses sustained in gambling transactions in which the plaintiff knowingly participated. It is not disputed that the losses were charged to the plaintiff and paid by him.
The defendant was farming when the transactions took place; he had lived in town five years, but had returned to the farm. He says Van Slyk suggested that the defendant join in the grain purchase deal; apparently Thoreson did not take part in this conversation. Hector *Page 653 
intimates that the first wheat deal had been made in his name; that Thoreson asked defendant if that was all right; and that Hector said it was. Thoreson says all he did was to write the telegrams and that Hector sent them himself — plaintiff says that he merely lent his credit with the commission house and prepared the messages. Hector says that the only conversation he had directly with Thoreson was when he asked the latter to buy 1,000 bushels of wheat for him. He says he never asked Thoreson to write any telegrams, but he does not deny that the messages sent were in fact written by plaintiff. Hector says Thoreson did not ask payment until about 1923; and he says that the real consideration for the note was the loss on the market in 1920. He says he understood that someone had to "go good" for the purchases; and that Thoreson was guaranteeing the account; that he asked Thoreson to buy the grain for him; and, he knew that he (Hector) was buying grain through commission houses; and if there was a loss he knew he would have to pay it and that he did pay $1,400, on account of the losses, leaving a balance later evidenced by the note in suit. There was an item of $250 for coal included in the note. Defendant testified that he never received any part of the grain purchased.
At the conclusion of the case the defendant offered to prove that Hector did not intend, when the grain was bought, to accept or receive any part of the grain. To this offer plaintiff objected unless it were also shown that this intention was communicated to the other party to the transaction. The counsel for Hector then said: "Well under my theory of the law it makes no difference whether it (the intention) was communicated or not, they all knew what kind of a transaction it was." The court then said:
The Court: It is your contention no difference how innocent Mr. Thoreson may have been in the deal if Hector had a secret intent in his mind not to actually receive the grain, but simply to work out a gambling transaction that that would bind M. Thoreson?
Mr. Brace: Yes sir.
The Court: Sustained.
Thoreson's testimony is to the effect that the deal was entirely between Van Slyk and Hector; that, as an accommodation, he wrote the *Page 654 
messages and loaned his credit with his firm so that cash need not be sent. Clearly the commission house extended credit to Thoreson with whom, as an elevator man, it had done business. Thoreson says Hector told him he wanted to protect himself — hence this purchase; that he had sold some of his own wheat; in short, that it was a legitimate hedging transaction; and that his firm would not handle a gambling transaction. Hector denies that he made such a statement to Thoreson. Thoreson says that Hector and Van Slyk dealt in grain before November, 1920, and that he had guaranteed their account before.
The defendant tried the case on the theory that if Hector never intended to receive the grain purchased for him, the transaction was one of wager and unenforcible by any party, regardless of the fact that the other party to the deal may have intended and assumed a bona fide purchase and sale to be followed by actual delivery. Such, he contends, is the meaning and effect of § 9699, Comp. Laws 1913, and particularly the last proviso therein. The rulings of the trial court were made in view of this theory; and it did not agree with the defendant in this interpretation of that statute.
Counsel for the defendant concedes that the holding of this court in John Miller Co. v. Klovstad, 14 N.D. 435, 105 N.W. 164, is against him, but insists that the enactment of § 9699, supra, modified the common law rule there applied and that since the enactment of that act the test of illegality is the intention of one of the parties. In the Miller case, supra, this court held that "The test of illegality is the intention not alone of one of the parties, but of both."
Section 9699, supra, was enacted as chapter 58, Sess. Laws 1905, and was aimed at bucket shops. This purpose is expressly stated in the law. It is in the Penal Code; and severe penalties are prescribed for violations thereof. The act reads: "It shall be unlawful for any corporation, association or society, person or persons, to keep within this state, any store, office or other place, wherein is conducted or permitted the pretending buying or selling of grain, pork, lard or any mercantile or agricultural products on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without this state; and the keeping of all such places is hereby prohibited; and it shall be unlawful for any person, corporation, association or society, within this state, to make or enter into any *Page 655 
contract, or pretended contract, such as is above stated and referred to, and all such contracts are hereby prohibited; the intention of this chapter being to prevent and prohibit within this state the business now engaged in and conducted in places commonly known and designated as bucket shops; provided, however,that this chapter shall not apply to or in any way affect anycontract for the actual buying or selling of any commoditywhatever for present or future delivery, where the actualdelivery or receipt of the thing sold is contemplated, and ingood faith intended by both of the parties to the contract."
Defendant relies mainly on the proviso which we have emphasized, supra. He contends that the effect of the use of the word "both" instead of "either" is to change the test of illegality in the manner heretofore stated.
We cannot agree with defendant's construction of the statute. It is a penal enactment; its clear purpose is to make it impossible to escape the penalty of the law by proving that the party not prosecuted, or one of the parties to the transaction, intended in good faith to receive or deliver at a future date. Suppose A and B are parties to an agreement within the prohibition of the Anti-Bucket Shop Act; A has no intention to deliver in good faith; B has such intention and is ignorant of A's unlawful purpose. In a prosecution of A it would be no defense to show B's lawful purpose. If, however, "either" not "both" had been used, the bona fides of B would seem to be a defense.
Again, suppose B brought suit against A for damages for breach of contract; A defends on the ground that he (A) never intended to deliver the grain and says that the contract was wholly void, it being unnecessary that more than one party to the agreement entertain the unlawful intent. If the position taken by the defendant in the case at bar be sound, this would follow. Clearly, the legislature did not intend such a result.
On the other hand, using the same illustration, no one would contend that a criminal prosecution against B could be maintained, merely because of A's criminal intent, when the former was acting in complete good faith and intended a lawful transaction. Yet, such is the effect of counsel's contention.
We do not believe that the rule in civil cases, stated in the John Miller Co. Case, supra, was modified by the enactment of § 9699. *Page 656 
There is no evidence or offer of proof respecting Van Slyk's purpose; he was seemingly Hector's partner in the deal. And there being no evidence or offer of proof that the other party knew of any unlawful purpose Hector may have had in view, or that Thoreson was so deeply or intimately connected with the transaction as to be precluded from recovering his loan, or knew of its unlawful character, even if the arrangement was illegal, the rulings of the trial court, under defendant's own theory, were correct. See Buchanan Elevator Co. v. Lees, 37 N.D. 32, 163 N.W. 264.
The trial court directed a verdict for the plaintiff, over defendant's objection. Both parties moved for a directed verdict; but the defendant coupled with his motion a demand that if it were denied, the issues of fact be submitted to the jury. There was, however, no evidence on which a verdict for the defendant could have been based. Chapter 133, Sess. Laws, 1921, requires the court, when objection is made to granting a motion for a directed verdict, to "submit to the jury such issue or issues, within the pleadings on which any evidence has been taken." In other words, the law contemplates an issue of fact. If there be no issue of fact, there is nothing that can be submitted. Certainly, it cannot be reversible error to do in advance that which must inevitably be done after an erroneous verdict, namely: to order the only judgment which can be entered in view of the evidence.
In view of the defense theory, the objections to the rulings upon evidence are wholly devoid of merit.
Finding no prejudicial error in the record, the judgment is affirmed.
CHRISTIANSON, Ch. J., and BURKE, BIRDZELL, and NUESSLE, JJ., concur. *Page 657