JAMES K. RIORDON, Trustee, *et al.* Plaintiffs in Error, *vs.*
WILLIAM McCABE *et al.* Defendants in Error.

*Opinion filed October 25, 1930—Rehearing denied Dec. 11, 1930.*

DeYoung and Orr, JJ., dissenting.

James C. McMath, Barnes & Magoon, Claude Brown, and Kirkland, Fleming, Green & Martin, (Weymouth Kirkland, Charles F. Rathbun, and William H. Symmes, of counsel,) for plaintiffs in error.

J. L. Spaulding, for defendants in error.

Mr. Justice Stone delivered the opinion of the court:

These consolidated causes were brought by separate bills filed in the circuit court of Bureau county to foreclose two trust deeds, one given to secure a note for $25,000, dated August 27, 1921, due one year after date, with interest at seven per cent per annum, and the other for $30,000, dated

October 15, 1921, given to secure a note for a like amount, with interest at six and one-half per cent per annum. These notes and trust deeds were signed by defendants in error, made payable to the order of themselves, endorsed in blank by them and delivered to plaintiffs in error. The bills contain the usual averments for foreclosure of such trust deeds. The answers filed thereto allege that the notes and trust deeds were given to cover gambling transactions conducted by plaintiffs in error for defendant in error William McCabe on the Chicago Board of Trade and that there was no other consideration for such notes and trust deeds; that such gambling transactions consisted of pretended purchase and sale of grain and provisions for future delivery and in the purchase and sale of "bids" and "offers;" that at the time of such transactions neither plaintiffs in error nor defendant in error McCabe intended that delivery of the commodities sold or purchased should be made or received, but intended to settle such transactions on the difference in market prices of such commodities when the trade was opened and when it was closed; that in all such gambling transactions plaintiffs in error, with that knowledge, aided and assisted in concluding them for defendants in error, and that such notes and trust deeds were therefore wholly void. Defendants in error also filed cross-bills, praying that the notes and trust deeds be canceled and set aside as clouds on the title of defendants in error. The causes were referred to the master in chancery, who found that the allegations of the answers and cross-bills were true and recommended that the prayers of the cross-bills be allowed and that the bills be dismissed for want of equity. Exceptions to the master's report were overruled and separate decrees were entered in accordance with the recommendations of the master. Appeals were taken to the Appellate Court, where the causes were consolidated, and the decrees of the circuit court were affirmed. The consolidated causes come here on writ of *certiorari.*

As to the transactions which took place between these parties there is little controversy in the evidence, although extended arguments are made as to the construction to be placed on the evidence and the figures adduced thereby. The defense to these notes and trust deeds is based on sections 130 and 131 of the Criminal Code. (Cahill's Stat. 1929, p. 946.) Section 130 is as follows: "Whoever contracts to have or give himself or another the option to sell or buy, at a future time, any grain, or other commodity, * * * where it is at the time of making such contract intended by both parties thereto that the option, whenever exercised, or the contract resulting therefrom, shall be settled, not by the receipt or delivery of such property, but by the payment only of differences in prices thereof, * * * shall be fined not less than $10 or more than $1000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." Section 131 provides that all promises, contracts or agreements entered into, where the whole or any part of the consideration shall be for any money, property or other valuable thing won by any gaming, shall be void and of no effect.

Defendant in error William McCabe is a farmer residing near Tampico, in Bureau county. In 1903 he began dealing on the board of trade and did so intermittently from that time until the conclusion of the transactions out of which these causes originated. He had dealt with a number of different commission houses. He was at the time of the filing of these bills sixty-four years of age. In 1918 one of the plaintiffs in error, James K. Riordon, was then a member of the firm of Kempner & Co., which firm was later succeeded by the firm of Riordon, Windsor & Co., and after the death of Windsor the firm was re-organized and continued business as Riordon, Martin & Co., plaintiffs in error here. They did, and do, a grain commission business. In the early part of 1919 McCabe's transactions with

plaintiffs in error increased very largely. During 1919, 1920 and the greater portion of 1921 plaintiffs in error conducted for him very large transactions in the purchase and sale of grain and provisions, totaling seventeen hundred and nine purchases and a like number of sales. The total transactions aggregated 27,868,500 bushels of grain at a total price of $31,794,208.75. McCabe was not a member of the Chicago Board of Trade and could not execute such transactions in his own name on the board. He bought no grain or provisions for immediate delivery either through plaintiffs in error or any other broker or commission firm. A large part of his purchases and sales, and likewise "bids" and "offers," were conducted through an independent broker, who, as soon as the purchase or sale was made, turned in the transaction to the plaintiffs in error, who then entered it in McCabe's account, took charge of the transaction until closed, and the result, whether profit or loss, was reflected in their account with McCabe. Plaintiffs in error paid the brokerage fee to the broker and charged McCabe the regular commission. All transactions were made on the board of trade, the rules of which provided that each purchase or sale contemplated a delivery or acceptance thereof, as the case might be. McCabe's account with plaintiffs in error showed only his profit or loss. He was at no time charged with the purchase price of the commodity purchased for future delivery nor credited with the sale price, though the books noted the amount of the commodity and purchase and sale price. His account with plaintiffs in error shows that he was either debited or credited with a difference between the purchase and sale price. McCabe put up no margin and paid for no grain and took or made delivery of none. While he paid to plaintiffs in error large amounts of money in these three years, the same was not used to margin but to pay his losses, government taxes and commissions. The deals made by plaintiffs in error with other members of the board of trade, or by the

broker and turned over to plaintiffs in error, were settled by plaintiffs in error for McCabe by paying the loss or receiving the profit on the deal and the same was charged or credited in McCabe's account.

It is evident that in the early period of the transactions of McCabe with plaintiffs in error the latter considered him to be a man of means. The evidence showed that in 1918 he had 1400 acres of farm land, valued at $200 per acre, and a bank credit of $125,000. During 1920, after the price of lands had decreased, the evidence shows that McCabe's 1400 acres of land was valued at $100 per acre. It also shows he had paid out to plaintiffs in error on transactions conducted for him, the $125,000. McCabe's speculation grew more and more unfortunate. Late in 1920 defendants in error executed to plaintiffs in error a mortgage for $50,000, proceeds of which were turned over to meet McCabe's losses. On June 1, 1921, this mortgage was taken up through a loan secured from a fraternal benefit society in the sum of $60,000, and the balance of the proceeds was turned over to plaintiffs in error. As we have seen, on August 27, 1921, the trust deed involved here, securing a note of $25,000, was given plaintiffs in error, and on October 14, 1921, the trust deed and note for $30,000 followed the same course. These notes, mortgages and trust deeds were given to pay McCabe's overdraft in his account with plaintiffs in error representing his losses and were not used to purchase grain or provisions. From time to time McCabe drew out of his account various sums of money. By January 1, 1920, his net gains had amounted to many thousands of dollars. On that day, however, according to McCabe's evidence, his account showed an overdraft of $692.92. Plaintiffs in error's evidence puts the amount at something over $700. During the year 1920 McCabe paid to plaintiffs in error in money, checks, drafts and certificates of deposit an aggregate of $186,624.08 and drew out of his account $125,048.49. In 1921 he paid in $70,444.02 and

drew out $4333.70, showing a loss in 1920 of $61,575.59, and in 1921 of $66,110.32, or a total loss in the two years immediately preceding the giving of the second trust deed here involved, of $127,685.91. Later this loss was reduced somewhat by a net credit of $13,800 on an account carried in the name of his son.

Counsel do not seriously disagree as to the law but rather as to its application in this case. The only question involved is whether the deals were made with the intention on the part of both McCabe and plaintiffs in error that no deliveries should be made or accepted and that settlement should be made only on market differences. If the deals out of which these trust deeds and notes arose were so made they are in violation of section 130 of the Criminal Code and the notes and trust deeds are void. Unless the evidence, when considered in its entirety, fairly shows such intention on the part of both parties at the time the transactions represented by such trust deeds and mortgages or parts thereof were made, the trust deeds and notes are legal and should be foreclosed. The burden of showing that transactions were gambling in their nature is upon the party making such claim. (*Pelouze* v. *Slaughter,* 241 Ill. 215; *Grubey* v. *National Bank of Illinois,* 133 id. 79.) All transactions in grain or other commodities, where the understanding exists between the parties that no deliveries are to be actually made but the purchases and sales are to be adjusted by the mere settlement of difference in prices, fall within the meaning of section 130 of the Criminal Code and are void. *White* v. *Turner-Hudnut Co.* 322 Ill. 133; *Pratt & Co.* v. *Ashmore,* 224 id. 587; *Weare Commission Co.* v. *People,* 209 id. 528; *Pope* v. *Hanke,* 155 id. 617; *Schneider* v. *Turner,* 130 id. 28.

Counsel for plaintiffs in error argue earnestly that since all McCabe's purchases and sales took place on the board of trade under the board of trade rules they are legal and valid, and that to hold otherwise would be to destroy this

agency of commerce. In order to constitute such transaction gambling, both parties must intend or understand that settlement shall be had, not by receipt or delivery of such commodity but by payment, only, of the differences in the price thereof. (*White* v. *Turner-Hudnut Co. supra.*) It seems obvious that the validity of the rules of the board of trade or its welfare are in nowise involved in this proceeding. The act applies to transactions on the board of trade by members thereof as well as to other transactions involving gambling in grain futures. As has been frequently said by the courts in this country, it is quite as easy to conduct gambling transactions under the rules of the board of trade as it is legitimate transactions, and the validity of the rules of the board or its integrity as a business agency is in nowise involved. Since the matter is one entirely of intention, it is not material, under this statute, whether these transactions, so far as the board of trade or members thereof with whom the contracts for purchase or sale are made are concerned, occur under the rules of the board or quite outside of them. The intention of the board member selling to or buying from McCabe through plaintiffs in error is likewise not involved. The validity of the notes and trust deeds depends upon the intention of McCabe and plaintiffs in error concerning the transactions which were had on the board of trade under its rules, and therefore valid on their face. The statute has prescribed that the intention of the parties shall govern. It is commonly recognized that one may use a transaction valid on its face for an illegal purpose. One may lawfully sell goods or stocks for future delivery even though he has none in his possession, if he intends and agrees to deliver them at the appointed time, but purchases made with the understanding and intention that the contract will be settled by paying the difference between the contract and the market price at a certain time fall within the statute against gambling. They stand on a different ground from pur-

chases made merely with the expectation that they will be satisfied by a sale if to the advantage of the purchaser, which may be set off against such purchases. (*Weare Commission Co.* v. *People, supra; Board of Trade* v. *Christie Grain and Stock Co.* 198 U. S. 236.) The intent to deliver or receive delivery is thus vital in determining whether the transaction is legal or illegal. The rules of the board of trade provide for acceptance and delivery, and in order to invalidate a contract as a wagering one both parties must intend that instead of the delivery of the article there shall be payment of the difference between the contract and the market price. (*Clews* v. *Jamieson*, 182 U. S. 461.) The fact that no delivery actually took place may or may not be of importance in determining the legality of the contract. In more than seventy-five per cent of the transactions on boards of trade and in chambers of commerce there is no physical delivery either of the grain or provisions purchased, or of the net amount thereof, when sales of like grain or provisions are set off against such purchases, as is commonly done by either what is known as the "ring" method or by the "direct" method. The Chicago Board of Trade is a great market, in which is transacted a large percentage of the grain and provision business of the world. The law does not require that all contracts be confined to sales for immediate delivery. There is no legal or moral objection to an endeavor to forecast the future and to make agreements according to such portent as trade or economic conditions may indicate. Speculation of such a character is of substantial value in avoiding or lessening the effects which arise from a want of equalized prices of commodities or a disordered market, and there is no legal objection to the purchase or sale of commodities for future delivery even though the parties to the contract intend that if it be to their advantage they will either sell or buy for future delivery a sufficient amount of such commodities, so that when one is set off against the other they shall not suffer

loss. So in this case, there is no evidence that the board of trade keeps a place where pretended and unlawful buying and selling are permitted by it. This fact, however, does not and cannot prevent a violation of section 130 of the Criminal Code where the intent of the parties as to a given transaction falls within the statute.

Counsel for both parties have gone into extended argument concerning the figures in this case to show on the one hand and to refute on the other, the proposition that both parties to these transactions understood or intended that there should be no deliveries but that the transactions should be settled only on difference in prices. This is the gist of this lawsuit. McCabe testified that he did not intend to take or make deliveries in any of his transactions and that plaintiffs in error understood there was to be no delivery. Plaintiffs in error each testified that they intended that deliveries should be made or taken, wherever necessary, in accordance with the contract made. It seems unnecessary to argue that if the intention of the parties is to be determined by their words alone, then in such proceedings as here brought it would be impossible to show a violation of the law. The rule is, that it is immaterial whether the real intention is formally expressed in words if the circumstances in evidence show such intention, and a statement of intention that delivery should be made will not be allowed to prevail if the circumstances show the intention to have been that there should be no actual delivery of the commodities or acceptance thereof but merely an adjustment on differences. (*Weare Commission Co.* v. *People, supra; Jamieson* v. *Wallace,* 167 Ill. 388.) Circumstantial evidence may be used and relied on to establish the intention of the parties with reference to delivery and method of settlement. (*Stewart* v. *Dodson,* 282 Ill. 192; *First Nat. Bank* v. *Miller,* 235 id. 135; *Pratt & Co.* v. *Ashmore, supra.*) While the testimony of the parties as to their intention is competent, yet it is by no means controlling when the transactions

themselves and the manner in which they were conducted indicate that it was not the intention of the parties to make delivery but that settlement was to be made on differences. (*Pratt & Co.* v. *Ashmore, supra.*) In a determination of the issue as to intention it is proper to consider the financial ability of the dealer to handle the volume of grain or provisions dealt in; (*Jamieson* v. *Wallace, supra;*) his facilities for handling the same; his use or lack of use for such commodity; (*Weare Commission Co.* v. *People, supra;*) the knowledge of the broker or commission merchant as to such financial ability and facilities of his client; the fact, if it is a fact, that profits and losses were adjusted by way of differences in the market price, (*Bartlett* v. *Slusher,* 215 Ill. 348,) and any other circumstance having a tendency to show the real intention of the parties.

It is argued by counsel for plaintiffs in error that at no time was McCabe unable to take the amount of grain purchased, while counsel for defendants in error contends that he was not at any time able to take such commodities. Counsel for plaintiffs in error argue that the evidence shows that having purchased a half million bushels of wheat at $1.40 per bushel he could have gone to a bank with the warehouse receipt and borrowed enough on such receipt to have taken delivery of the grain. The evidence showed that the banks were willing to loan to their customers on warehouse receipts as much as seventy-five per cent of the market price of grain, and it will be observed, of course, that if the grain purchased by McCabe went up sufficiently in price he could have borrowed on a warehouse receipt if in his possession and assuming that he had banking connections. The evidence does not show that he had such banking connections in Chicago. If, however, the price of the commodity declined rapidly, it is obvious that McCabe would need banking facilities for another loan to complete the purchase.

McCabe's account consisted of debits and credits of the amount of the difference between the contract price and the

price when the deal was closed out, which were kept as "Cr. difference" and "Dr. difference." Counsel for plaintiffs in error argue that plaintiffs in error believed McCabe to be a man of means sufficient to meet the obligations arising out of his deals, and that since the debits in his account represent only his loss in his purchases and sales, such debits are not to be taken as evidence of any intention on their part that no deliveries should be made or received but that the settlement should be made on differences, though all settlements were so made. This brings us to a consideration, then, of McCabe's financial ability as reflected in his account and holdings.

As it is not essential to the decision of this case and would extend this opinion beyond reasonable limits to set out an anlysis of all the transactions between these parties, we may confine ourselves to the period during which these trust deeds were given and need go no further back than March 22, 1921, to show McCabe's financial condition as evidence of the intention of the parties in making the deals reflected in these trust deeds. It is conceded that prior to 1920 McCabe had received large gains from his deals through plaintiffs in error and their predecessors. On March 22, 1921, McCabe had outstanding against his land, which the evidence showed was then worth $100 per acre, or $140,000, a mortgage of $50,000, leaving an equity of $90,000 in that land. The evidence discloses that the large surplus in his bank account had at that time been wiped out. On that day his overdraft with plaintiffs in error amounted to $37,235.08. For the balance of that month the least overdraft was $32,689.59. During the month of April, 1921, his highest overdraft was $89,776.89 and his lowest overdraft was $28,443.06. During the month of May, 1921, his highest overdraft was $97,026.19 and his lowest overdraft was $77,011.75. In June, 1921, his highest overdraft was $75,184 while his lowest overdraft was $14,993.66. On the first of this month defendants in er-

ror executed the mortgage for $60,000 hereinbefore mentioned. In July of that year his overdrafts ranged between $38,130.62 and $24,608.71. In August, the month in which the trust deed to secure the $25,000 here involved was given, his overdrafts ranged between $38,056.88 and $53,213.60. During the month of September his overdrafts ranged from $40,531.10 to $52,841.03. In October, the month in which the trust deed to secure the $30,000 involved here was given, his overdraft on October 14, the day of the execution of that trust deed, amounted to $49,358.52. These figures evidence McCabe's financial ability during that period. The two trust deeds given against McCabe's land were given to plaintiffs in error during this period, while the third, for $60,000, was given to a fraternal benefit insurance company with the knowledge and assistance of plaintiffs in error, and it can scarcely be said, in view of this fact and the fact that McCabe became so deeply indebted to them, that plaintiffs in error did not know his financial condition. It is scarcely conceivable that they would have continued blindly in so dealing with him. Yet the evidence shows that between the 21st of March, 1921, and the giving of the mortgage for $60,000, about June 1, they conducted purchases for McCabe of 930,000 bushels of wheat at a sale price of $1,033,931.25; that from the 17th of June up to the time of the giving of the second trust deed on October 14, they conducted purchases for him of 220,000 bushels of a value of $250,755.75, making a total purchase during that period of 1,150,000 bushels of grain at a sale price of $1,368,712.50. During that period his sales handled by them amounted to 1,355,000 bushels at a sale price of $1,368,712.50. It seems clear that at the time these purchases were made and during this period following March 21, 1921, plaintiffs in error must have known that McCabe could not have taken delivery of the commodities purchased. It could scarcely be said, therefore, that they intended that he should take these deliveries or that they should take them for him. These cir-

cumstances are very strong evidence that during this period not only McCabe, but plaintiffs in error, intended that there should be no deliveries received or made of the commodities bought or sold, and that therefore the transactions during that period, which make up at least a part, if not all, of the consideration for the trust deeds in question, arose out of violations of this act. This conclusion is further supported by the evidence showing that plaintiffs in error, as the delivery month approached, required McCabe to close out his purchases, and he testified that at times they closed them out without consulting him. Plaintiffs in error's evidence showed that they always told him that he would have to close out or make arrangements to take delivery, and in view of the fact that they must have known, during the period for which we have analyzed the transactions, that he could not have taken delivery, their notice to him amounted to a demand that he close out his transactions. This, under such circumstances, would necessarily, as plaintiffs in error must have known, amount, in substance, to an intention that settlement should be made only on differences in price. We are of the opinion that as to the period prior to March 1, 1921, the evidence does not disclose an intention on the part of plaintiffs in error contrary to the statute, and had they desired to avoid the force of the circumstances arising thereafter they could readily have done so by refusing to deal longer with him, when on March 21, 1921, as the evidence shows, he lost something over $68,000 in one day's dealing.

We are of the opinion, therefore, that the circuit court did not err in the decrees entered in these cases, and the Appellate Court was right in its judgment affirming them. The judgment of the Appellate Court is therefore affirmed.

*Judgment affirmed.*

DeYoung and Orr, JJ., dissenting.