[File No. 6370.]

BECHER-BARRET-LOCKERBY CO., a Corporation, Appellant, v.
JULIUS SJOTHUN and A. R. Carlson,
and
JULIUS SJOTHUN, Respondent.

(262 N. W. 691.)

Opinion filed October 18, 1935.

*Hugo P. Remington,* for appellant.

*Burdick & Burdick,* for respondent.

BURKE, Ch. J. On August 19, 1929, Earl Robinson, manager of the Rutland Farmers Co-operative Elevator Company, wired the plaintiff, Becher-Barret-Lockerby Company, a grain commission firm at Duluth, Minnesota, as follows: "Buy one Dec. durum account Sjothun." The next day, August 20, 1929, the said Robinson wrote the said commission firm at Duluth and enclosed a check for $150, with instructions to margin Julius Sjothun December durum. On August 22, 1929 the plaintiff wrote to Mr. Robinson, as manager of the Rutland Farmers Co-operative Elevator Company, stating: "We also have your letter of the 20th enclosing check for $150, which has been credited to the account of Julius Sjothun to margin his open trade. We take it that you will guarantee all of these trades which we are carrying at the present time and will consequently not close them up when markets (probably means margins) are exhausted but will notify you when we need further protection." Robinson, as manager and on behalf of the Rutland Farmers Co-operative Elevator Company, did guarantee the accounts referred to in plaintiff's letter, exhibit 5. Under date of August 19, 1929, plaintiff sent Robinson a confirmation of the Julius Sjothun purchase of one thousand bushels of durum. On October 29, 1929, the defendant paid to the said Earl Robinson $50, as a further margin. On November 26, 1929, said Earl Robinson wrote a letter to the plaintiff at Duluth, in which he states: "In regard to open trades sent in from here, would like to have them changed over to May. Walter Strand would like to have his Dec. durum changed to July if possible but if there is no trading in July, change to May." On November 29, the plaintiff sold the thousand bushels of durum wheat on the market and made a repurchase of another thousand bushels of durum wheat for May delivery, upon which there was a loss of $221.37, $21.37 more than the margins paid. On April 28, 1930, Robinson again instructed the plaintiff to change the time of the delivery from May to July and the plaintiff accordingly sold the thousand bushels of May wheat and repurchased a thousand bushels to be delivered in July, upon which there was a loss of $317.60, making a total loss claimed by the plaintiff

of $338.97, which was charged to the Farmers Co-operative Elevator Company of Rutland on May 6, 1930. On May 24, 1930 Julius Sjothun endorsed a wheat check for Robinson for $137.30, which was credited to the account of Sjothun by the plaintiff. On June 27, 1930 the said Robinson again instructed the plaintiff to change the time of the delivery from July to September, which resulted in another loss of $156.24. On July 12, 1930 Robinson wrote the plaintiff company to "place stop loss orders on all options at 80 cents." On July 17, 1930 the plaintiff sold out the defendant's thousand bushels of December durum, which resulted in a further loss of $25.09, which the plaintiff charged to the account of the Farmers Co-operative Elevator Company. On August 15, 1930 the defendant paid to Earl Robinson $123.90 to margin another thousand bushels of grain, which grain was duly purchased by the plaintiff and sold out in September, upon which there was a loss of $111.53. The losses, over and above the amount of money paid by Sjothun as margins, were charged, by the plaintiff, to the Rutland Farmers Co-operative Elevator Company and Sjothun was credited therewith. Robinson, under instructions from the plaintiff, made the same charge against the same elevator company and gave the same credits to the defendant and out of the proceeds of the grain shipped, by the said elevator company to the plaintiff, the losses were paid leaving, on the plaintiff's books, a balance due defendant of $12.57.

The only correspondence that the defendant had directly with the plaintiff was the letter of January 2, 1931, asking for a statement of his account. On January 5, 1931 the plaintiff sent the defendant a statement showing a balance of $12.57 due the defendant from the plaintiff. On receipt of this statement the defendant wrote asking for payment of the balance and the plaintiff forwarded to the defendant check for $12.57, to balance its account with the defendant.

Thereafter the Rutland Farmers Co-operative Elevator Company brought an action against the plaintiff to recover the losses occurring through the purchase and sale of grain on the Duluth market ordered and guaranteed by Robinson and paid out of the proceeds of grain actually shipped to the plaintiff's commission house. The case was settled by the plaintiff paying to the Rutland Farmers Co-operative Elevator Company the amount of said losses and the claims against Sjothun,

which had been charged to Sjothun on the books of the elevator company amounting to $383.10, were assigned to the plaintiff, who brought action against the defendant on the assigned claims. The case was tried to the court without a jury and the trial judge found as a fact "That the transactions . . . resulting in the loss of cash margins of $448.83, and a further indebtedness on account in the sum of $383.10 . . . were transactions, where the actual receipt and delivery of grain, was neither intended or performed, by the defendant or the plaintiff and where said transactions were mere wagers on the future price of grain and known by both parties to be such," and as a conclusion of law the court said "that said transactions were gambling transactions, and were null and void." The action against the defendant A. R. Carlson was dismissed without objection. The plaintiff duly appealed and demanded a trial de novo in this court.

It is well settled that while contracts for the sale of property to be delivered in the future are valid where the parties actually contemplate a delivery of the subject-matter, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them, yet if, under the guise of a contract which has the appearance of validity on its face, the real intention is merely to speculate on the rise or fall of the market, without any purpose that any property shall be delivered or received, but with the understanding that at the appointed time the account is to be adjusted by paying and receiving the difference between the contract and the current price, then the contract is a gambling contract and void. Dows v. Glaspel, 4 N. D. 251, 60 N. W. 60; Beidler & R. Lumber Co. v. Coe Commission Co. 13 N. D. 639, 102 N. W. 880; John Miller Co. v. Klovstad, 14 N. D. 435, 105 N. W. 164; Thoreson v. Hector, 54 N. D. 651, 210 N. W. 169; Mohr v. Miesen, 47 Minn. 228, 49 N. W. 862; McCarthy v. Weare Commission Co. 87 Minn. 11, 91 N. W. 33; Askegaard v. Dalen, 93 Minn. 354, 101 N. W. 503; Elliott v. McAllister, 106 Minn. 25, 117 N. W. 921; Bolfing v. Schoener, 144 Minn. 425, 175 N. W. 901; Fraser v. Farmers Co-op. Co. 167 Minn. 369, 209 N. W. 33, 913; Riordon v. McCabe, 341 Ill. 506, 173 N. E. 660, 83 A.L.R. 512 and voluminous note beginning on page 523; Dickson v. Uhlmann Grain Co. 287 U. S.

581, 77 L. ed. 508, 53 S. Ct. 362, 83 A.L.R. 492 (C. C. A. 8th) 56 F. (2d) 525.

If it was the intention of both parties to speculate on the rise and fall of the market without any purpose that any property should be delivered or received, but with the understanding that at the appointed time the account was to be adjusted by paying and receiving the difference between the contract and the current price, then the contract is void and the plaintiff cannot recover.

It clearly appears, from the record, that Sjothun was gambling on the market. He testified that when the durum wheat was purchased he had no intention it would ever be delivered. He says he told Robinson that when a change-off was necessary Robinson was to make it, like in all speculating transactions. Robinson admits he made the changes without consulting Sjothun, although he states he told him afterwards. Sjothun testified that at the time he turned over the warehouse receipt he had about 160 bushels of wheat, or as he says "maybe one or two bushels either way in the elevator," which was represented by the warehouse receipt There is nothing to show it was durum wheat, and if that is all the wheat he had, the purchase of a thousand bushels of durum couldn't be hedging against a sale of 160 bushels, besides the purchase was made before this wheat check, or warehouse receipt, was turned over to Robinson. Robinson says he handled the defendant's wheat, and if the purchase of the December durum wheat was a hedge, Robinson's books would have shown a sale of the thousand bushels of durum wheat on the same day the purchase was made in Duluth. Robinson's testimony is very evasive. He had been in the grain business for ten or eleven years. He explains what is meant by hedging and when he is asked what other kind of trades there are on the market, he evades the question by answering "The farmers no doubt hedge grain also." He is asked if there is such a thing as speculative trade and Robinson answers "It depends on what you call speculation." "Q. Well, I call one of where you buy without ever intending to receive the article you buy." There is no question but what this would involve a gambling transaction, so far as the defendant was concerned, and if he bought without intending to receive the article, and there was no intention

on the part of either party to the transaction that there should be a delivery of the grain purchased, and the intention is merely to speculate on the rise and fall of the market, then the contract is a gambling contract and void. But to this question Robinson answered: "Not necessarily. I would say no." In other words such a purchase of grain on the market without any intention of delivery, according to Robinson, would not be a gambling transaction and yet, Robinson had been in the grain business for ten or eleven years, and as stated by Judge Corliss in the case of Dows & Co. v. Glaspel, 4 N. D. 251, 60 N. W. 60, "It is sufficient if the defendant's purpose was to gamble, and the plaintiffs knew of it when they went upon the board of trade to make such purchases or sales for the defendant. . . . It is a well known fact that a large percentage of such transactions are only wagering operations. No one knew this better than the plaintiffs when they received the defendant's different orders to buy and sell. At no time during all these transactions was there a suggestion from either plaintiffs or defendant that a bushel of this wheat was to be delivered to or by the defendant. He was never informed of the names of the different brokers of whom these purchases or to whom these sales were made. He never knew who were the principals back of such brokers with whom he had entered into contracts calling for the delivery, on plaintiff's theory, of thousands of bushels of wheat. His indifference to this matter of delivery all through these transactions was certainly suggestive to plaintiffs, who were familiar with such indifference, and the reasons for it, though having witnessed it in a multitude of similar transactions. From the very beginning the defendant pursued the course of closing out these purchases long before the day of delivery had arrived; . . ."

In the case of Glasgow v. Nicholls, 124 Wash. 281, 214 P. 165, 35 A.L.R. 419, the Washington court said: "Considerable argument is indulged in by the respondents to establish that the business relationship between Milholland & Hough and Nicholls & Co. was legitimate and not inhibited by our statutes, or at common law. It is true that the hand is the hand of Esau, but the voice is the voice of Jacob. Although the form of legitimate trading was preserved, the fact is that the transactions were illegal. As the United States Supreme Court said, in Irwin v. Williar, 110 U. S. 499, 511, 28 L. ed. 225, 230, 4

S. Ct. 160, 166: 'Gambling is none the less such because it is carried on in the form or guise of legitimate trade.' It might, therefore, be the case that a series of transactions, such as that described in the present record, might present a succession of contracts, perfectly valid in form, but which on the face of the whole, taken together, and in connection with all the attending circumstances, might disclose indubitable evidences that they were mere wagers."

On the request of the plaintiff Robinson, without authority of the elevator company, guaranteed, for and on behalf of the elevator company, of which he was manager, all of the trading accounts. It is true that he states he told Mr. Carlson, president of the elevator company, about the guaranty, but this is denied by Carlson, who states he had no notice of any such agreement and it was also unknown to Sjothun. The guaranty included all trading accounts, the losses upon which were paid out of the proceeds of the grain shipped by the elevator company to the plaintiff, amounting to $7,500. It was subsequently paid back to the elevator company after it had brought suit against the plaintiff therefor.

If the defendant told Robinson that when the amount of the wheat check was exhausted he was through and would not put up any more, it might explain why Robinson did not ask him to put up additional margins before selling him out. Robinson testified that he had an arrangement with the plaintiff's firm, but when asked with whom he had made the arrangements, he says: "it was generally understood." He again evades the question and does not state with which member of the firm he had the agreement. He states he knows Mr. Barret, a member of the firm, and that he, Barret, was "field man" for the firm in that territory. He said Barret did visit his place of business but no arrangements were made with him and later he testified that Barret was not there when any of these transactions were made. Mr. Barret was not only field man, but he was a member of the plaintiff's firm and known to Robinson. As a field man he was in that territory for business and it is not probable that he went to this elevator and saw Robinson without talking business. The things that Robinson did, at the request of the plaintiff, show a thorough understanding, and through Robinson the plaintiff must have known what every one of these transactions was The plaintiff did not do any business with the defendant. It was all

with Robinson, acting for and charging everything to the elevator company.

The testimony of Baume, president of the plaintiff, is just as evasive as the testimony of Robinson. After explaining how a farmer might engage in hedging transactions he is asked "Might he not also conduct a series of transactions that are entirely speculative and not based on any wheat?" That is a fair question and it is one easily understood by a man who had been in the grain business for a great many years and was president of a commission house, operating in both Duluth and Minneapolis; but in answer to this plain, simple question he said: "God Almighty don't know that." There was a motion to strike out the answer as not responsive and witness tried to further evade the question by answering "I wouldn't be qualified to tell you what a farmer might do." Counsel for the defendant states "I am going to get an answer to that one question, if the Court will let me, if it takes a week," and Baume is again asked ". . . isn't it possible for a farmer to conduct trades in wheat at a local elevator, none of which are based on the possession of any grain at all?" That is the same question in a little different form and if a farmer could make such a trade the answer would be "yes" and if he could not it would be "no." But how does Mr. Baume answer it? His answer is "If a farmer goes to the elevator and says, 'I want to buy me some wheat,' I have no way of knowing whether he holds any wheat or whether he is hedging or whether he wishes to retain part of his crop or whether he wishes to speculate." His answer is not responsive. The defendant's next question "Is other words he could do that?" is answered "Sure, a farmer could speculate if he wanted to."

In the case of Riordon v. McCabe, 341 Ill. 506, 173 N. E. 660, 83 A.L.R. 512, the Illinois court, in line with the great weight of authority, holds that "(1) The burden of showing that dealings in grain on a board of trade were gambling transactions is on the party making them; (2) the fact that purchases and sales of grain took place on a board of trade under board of trade rules providing for acceptance and delivery does not necessarily establish that they are not gambling transactions; (3) the fact that no delivery of a commodity bought or sold for future delivery actually took place may or may not be of importance

in determining the legality of the contract as a gambling transaction; (4) in determining the character of purchases or sales of a commodity for future delivery as gambling transactions, it is immaterial whether the real intention is formally expressed in words if the circumstances in evidence show such intention, and a statement of intention that delivery should be made will not be allowed to prevail if the circumstances show the intention to have been that there should be no actual delivery of the commodities, or acceptance thereof, but merely an adjustment on difference in prices; (5) circumstantial evidence may be used and relied on to establish the intention of the parties to a sale or purchase for future delivery that there shall be no actual delivery, but that the transaction shall be settled by payment of the difference in prices; (6) the testimony of the parties to a purchase or sale for future delivery that actual delivery was contemplated is by no means controlling when the transactions themselves and the manner in which they were conducted indicate that settlement was to be made on difference in prices."

In the case of Beidler & R. Lumber Co. v. Coe Commission Co. 13 N. D. 639, 102 N. W. 880, the court said: "When the validity of a contract of sale for future delivery is involved, and it is shown that in numerous other and similar transactions no deliveries were made, but that the settlements were made upon differences in market quotations, the person relying upon the validity of such a contract must make it satisfactorily and affirmatively appear that the contract was made with a view to actual delivery."

Robinson testified that on these transactions no actual wheat changed hands at all. All of the trading on the open market appears to have been handled as a "job lot." In his letter of November 26, exhibit 8, he says, "In regard to open trade sent in from here would like to have them changed to May." On June 27, in his letter, exhibit 10, Robinson says: "Please change all open July trade to September." In his letter to plaintiff, exhibit 11, he states: "Confirming our telephone conversation of this afternoon. Place stop loss orders on all options at 80 cents. In event of a raise follow with stop loss 2 cents under each close." The stop order was made at the request of the plaintiff and without notice to the defendant.

From the entire record it clearly appears that the parties had no

actual intent to deliver any of the grain purchased and the trades were made with the understanding that the account would be adjusted by paying and receiving the difference between the contract price and the current price. The transactions were gambling transactions and the judgment is affirmed.

BURR, CHRISTIANSON and MORRIS, JJ., concur.

NUESSLE, J., concurs in the result.