[File No. 6636.]

HOOVER GRAIN COMPANY, Respondent, v. A. AMUNDSON and Wm. Robinson, Appellants.

(293 N. W. 196.)

Opinion filed June 6, 1940.

*Chas. A. Lyche,* for appellants.

*Carroll E. Day* and *Arthur W. Stokes,* for respondent.

188

BURKE, J. Plaintiff brought suit against the defendants in the dis-. trict court of Grand Forks county upon two promissory notes in the sum of $300 each. After trial and pursuant to the verdict of the jury, judgment was entered against the defendants and each of them for an amount equal to the face of the notes and accrued interest or the sum of $884.76. Thereafter in the trial court the defendants moved for judgment notwithstanding the verdict or for a new trial. The motion was denied and defendants have appealed both from the order denying the alternative motion and from the judgment.

The complaint is the usual complaint in a suit upon promissory notes. The defendants answered separately, each interposing three defenses to plaintiff's causes of action. Both defendants admitted the execution of the notes but alleged that they were given to the plaintiff in settlement of losses incurred by the defendant, Amundson, in certain gambling transactions had with the plaintiff, and the issues raised by this defense were the only issues submitted to the jury under the trial court's instructions. The defendants assert that the evidence conclusively establishes the defense of a gambling transaction and that

'the verdict of the jury and the judgment are therefore contrary to the evidence and contrary to law.

. Plaintiff is a corporation engaged in business as a grain commission merchant at Minneapolis, Minnesota. It buys and sells grain for its customers, executing their orders at the Minneapolis Chamber of Commerce and charging a commission for its services. The defendant, Robinson, was the grain buyer and manager of an elevator owned and operated by the Manvel Grain Company at Manvel, North Dakota. The defendant, Amundson, is a farmer residing near Manvel, North Dakota. In 1928, 1929 and 1930, his annual wheat crop averaged between 2,000 and 2,500 bushels. His wheat was sold for cash at the Manvel Grain Company's elevator.

On October 16, 1928, Amundson commenced a series of purchases and of sales of "wheat futures." All orders for both purchases and sales were placed with the Manvel Grain Company. Robinson as manager of the Manvel Grain Company forwarded the orders to the Hoover Grain Company which executed them at the Minneapolis Chamber of Commerce. There is no question but that the contracts for such purchases and sales were on their face binding contracts and that both the Hoover Grain Company and Amundson were ostensibly bound to accept or make delivery at the appointed time of the wheat purchased or sold. These transactions continued over a period of twenty-five months. Three principal trades are involved but due to the fact that Amundson on many occasions "switched" his trades from one future to another, there were nineteen separate purchases or sales. The purchase and sale records, which were offered and received in evidence as defendants' exhibits 100 to 109, inclusive, disclose the course of these trades. On October 16, 1928, Amundson purchased 2,000 bushels of wheat for delivery in May 1929. He closed out this trade by selling 1,000 bushels on February 14, 1929, and 1,000 bushels on February 25, 1929, making a profit of $124.74. On March 11, 1929, he entered the market again by purchasing 1,000 bushels of wheat for May delivery. On April 22, 1929, he "switched" the trade to July delivery and on June 29, 1929, he again "switched," this time to September delivery. He closed out by selling the September wheat on July 18, 1929. His net profit on this trade after deducting commissions and intermediate losses was $190.91. Up to this point Amundson's market

operations were highly successful. He had gained a total profit of $315.65. The evidence in the case does not disclose that this sum was ever paid to him but the purchase and sales records show it was credited to his account with the Hoover Grain Company. Amundson's last and disastrous venture in the grain market began on September 3, 1929, when he bought 1,000 bushels of wheat for delivery in December, 1929. Then followed a series of "switches," from December to May, 1930, to July, to September and again to December. The December, 1930 wheat was sold on November 12, 1930. His total loss on these transactions including commissions was $951.75. His net loss after deducting previous profits was $636.10. On November 13, 1931, Amundson, at the request of C. E. Colosky, a director and the secretary of the Manvel Grain Company, and Dan Stewart, a traveling representative of the Hoover Grain Company, executed the notes here in suit, in settlement of the indebtedness incurred by his losses. At a later date, which is not shown in the record, the notes were also signed by the defendant, Robinson. The notes were made payable to the Manvel Grain Company and were endorsed "Pay to Hoover Grain Co. or order without recourse, Manvel Grain Co. by C. E. Colosky, Sec."

Amundson's testimony was that at the time he purchased wheat for future delivery, "he did not contemplate buying wheat;" that he was "working on the fall and rise in the market;" that the notes were given "for betting on this market." He did not claim that he disclosed his intent to any person and when asked, "Do you know anything about whether the Hoover Company expected to deliver it (the wheat) in case you wanted it delivered?" answered, "I don't know anything about that."

Similar transactions have been before this court on several occasions and the principles of law applicable are well settled. Contracts for the sale of commodities for future delivery are presumed to be valid and the burden is on the party asserting the contrary to establish such fact. Such contracts are void as wagering contracts if the parties do not contemplate actual delivery of the commodities purchased, but contemplate settlement by paying the difference between the contract price and the market price upon the delivery date. The test of illegality is not the intention of one party to the contract but of both. John Miller Co. v. Klovstad, 14 N. D. 435, 105 N. W. 164; Thoreson v. Hector,

54 N. D. 651, 210 N. W. 169; Edgeley Co-op. Grain Co. v. Spitzer, 48 N. D. 406, 184 N. W. 880, 20 A.L.R. 1417; Becher-Barret-Lockerby Co. v. Sjothun, 66 N. D. 168, 262 N. W. 691.

In this case there is no direct evidence that throws any light upon what plaintiff's intention was at the time of the making of the contracts. Upon this question Robinson was silent and Amundson frankly stated he didn't "know anything about that."

The contention here is that the circumstances are conclusive; that the fact that Amundson made nine purchases of wheat for future delivery and in every instance balanced his account by selling a like amount before the delivery date is subject to no interpretation, except that at the time the contracts were made, the parties did not contemplate delivery but agreed to make settlement by the payment of the difference between the contract and market prices upon the delivery date.

With this contention we do not agree. In John Miller Co. v. Klovstad, 14 N. D. 435, 443, 105 N. W. 164, we said: "What the parties may have done, or what they may have contemplated doing in the matter of delivery of actual grain, is not controlling, but, rather, what they believed and contemplated they had a legal right to do under the contract in this regard is the test. Any other rule would greatly hamper the millions of legitimate transactions taking place every week in the business world, and would do away with the great convenience of the clearing houses. The essence of a gambling transaction is that the particular transaction shall contemplate no delivery, without reference to the making of any other deal. If the sales were to be mere bets on the market price, there was no occasion for a counter transaction, but all that would remain to be done would be for the parties to settle according to the price at the time specified in the contract."

In Gettys v. Newburger (C. C. A. 8th) 272 F 209, the court said: "There are lawful methods—to wit: by set-offs and ringing off, and the payment of differences—of closing out such contracts, and discharging the liabilities of the parties thereunder before the times for deliveries of the property fixed therein arrive, so that no liability to deliver or receive or pay will exist at the fixed times for delivery. Where such contracts are closed out before such times of delivery, the legal presumption is, in the absence of substantial evidence to the contrary, that at

the time the parties made the contracts they intended to close them out by these legal methods and not by the illegal method of paying the difference between the contract prices and the market prices at the time of delivery. . . ."

In Board of Trade v. Christie Grain & Stock Co. 198 U. S. 236, 249, 49 L. ed. 1031, 1038, 25 S. Ct. 637, Justice Holmes said: "Purchases made with the understanding that the contract will be settled by paying the difference between the contract and the market price at a certain time . . . stand on different ground from purchases made merely with the expectation that they will be satisfied by set-off."

In Dows v. Glaspel, 4 N. D. 251, 256, 60 N. W. 60, this court said: "We recognize the legal right of every one to speculate in every commodity which he does not own, and for which, as a commodity, he has no use. He may enter into a contract to buy or sell anything of value for the sole purpose of speculating,—with no other object in view than that of making profit out of the transaction; but he must in good faith bind himself to deliver or receive the thing sold or purchased. . . . The undisclosed purpose of one of the parties to a contract not to deliver or receive the article contracted for will not affect the other party, who, relying on a contract calling for delivery, intends in good faith that the contract shall be carried out in all its particulars."

It is thus apparent that both the contracts entered into by the plaintiff and the defendant, Amundson, for the purchase and sale of wheat and the method by which those contracts were discharged and settled, were on their face legal in all respects. It is true, we have held that the fact that such contracts are legal in form does not conclusively establish their legality, and that where there is a history of successive settlements without delivery, such contracts and the circumstances surrounding their inception should be closely scrutinized to determine if the parties have not merely clothed a wagering contract with a semblance of legality (Dows v. Glaspel, supra; Becher-Barret-Lockerby Co. v. Sjothun, 66 N. D. 168, 262 N. W. 691, supra; Beidler & R. Lumber Co. v. Coe Commission Co. 13 N. D. 639, 102 N. W. 880); but the task of evaluating those circumstances is one which is exclusively within the province of the jury, unless it can be said that reasonable men could not differ as to the inferences to be drawn therefrom. Hall v. Northern P. R. Co. 16 N. D. 60, 111 N. W. 609, 14 Ann. Cas.

960; Houghton Implement Co. v. Vavrowski, 19 N. D. 594, 125 N. W. 1024; Paulsen v. Modern Woodmen, 21 N. D. 235, 130 N. W. 231; Leroy v. Hagen, 44 N. D. 1, 175 N. W. 718.

In this case the jury, by its verdict, has found that the evidence did not warrant a conclusion that the contract between the plaintiff and Amundson was a wagering contract. We have searched the record carefully and have found proof of no fact or circumstance which of necessity would compel a conclusion contrary to the jury's verdict. The question of the intention of the parties was properly submitted to the jury and judgment is therefore affirmed.

NUESSLE, Ch. J., and BURR, MORRIS, and CHRISTIANSON, JJ., concur.