[No. 17556.   Department One.   April 5, 1923.]

# D. R. GLASGOW, as *Administrator etc., Appellant,* v. WALTER J. NICHOLLS *et al., Respondents.*[1]

GAMING (1)—PURCHASE ON MARGIN—GAMBLING TRANSACTIONS—STATUTES. A brokerage firm was guilty of running a bucket shop or gambling, and its contracts are void at common law, and under Rem. Comp. Stat., § 2475, where it was engaged in buying and selling stocks and bonds, grain, and other commodities on margins and credit, without any intention of receiving or paying for the property, the transactions being closed upon the basis of market prices quoted by some board of trade or stock exchange, and margins were deposited to cover fluctuations in prices.

GAMING (4)—TRUSTS (47)—PARTIES TO SPECULATIVE TRANSACTIONS—RECOVERY OF PROPERTY—LIABILITY OF TRUSTEE DE SON TORT. Where agents, entrusted with funds for the purchase of securities, embezzled the same and turned them over to a brokerage firm conducting an illegal bucket shop to be used in gambling transactions, the brokerage firm becomes a trustee *de son tort,* and cannot escape liability by showing that it has disposed of the property.

SAME. In such a case, the brokerage firm cannot plead that it received and transmitted the money merely as an agency for the agents who embezzled the same, where it had knowledge that such embezzlers were not using their own money; and for the further reason that the law recognizes no agency for an unlawful purpose, but makes all offenders against the law principals.

EVIDENCE (26)—PRESUMPTIONS—EVIDENCE WITHHELD—PARTY NOT TESTIFYING. Where a party accused of illegal acts does not offer himself as a witness, it is properly inferred that the truth would not have aided him.

TRUSTS (47)—ENFORCEMENT OF TRUST—ACCOUNTING — PROPERTY TRANSFERRED TO THIRD PERSONS. A trustee *de son tort* through using trust funds in illegal transactions, must account for the money passing into its hands, regardless of whether it made a profit thereon, to the extent of the funds so employed; but not for funds drawn on a New York bank, passing through its hands on transactions in which it had no such part as to make it a trustee.

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered May 31, 1922, in

[1]Reported in 214 Pac. 165.

favor of the defendants, in an action to establish a trust, tried to the court. Reversed.

*O. C. Moore* and *Turner, Nuzum & Nuzum,* for appellant.

*Post, Russell & Higgins,* for respondents.

MACKINTOSH, J.—James F. Callahan, a resident of Idaho, died in June, 1921. The appellant is the administrator of his estate *cum testamento annexo.* The respondents Nicholls are husband and wife; the husband, prior to September 21, 1921, conducting a business in the name of Walter J. Nicholls & Company, of which the respondent McBroom is now assignee for the benefit of creditors.

Milholland and Hough, between October 1, 1917, and January 1, 1921, were engaged as partners in Spokane in a general bond and security business. They were young men who, prior to the formation of the partnership, had been without resources other than salaries which they received as employees in a concern devoted to the purchase and exchange of stocks, bonds and securities. They opened their office and conducted their business adjoining the offices occupied by Nicholls & Company in one of the principal office buildings in Spokane. James F. Callahan turned over to them and delivered to them many stocks, bonds and securities of the value of more than $363,000, and certain sums of cash. This property was turned over with instructions to invest it or its proceeds in specified bonds and securities. Milholland and Hough, faithless to this trust, withheld, converted and embezzled Callahan's property, and in place of returning to him his moneys or stocks, bonds and securities, made and delivered forged bonds to him to the purported value of $355,000. The money obtained by Milholland and Hough from

Callahan and the proceeds of the sales of his stocks, bonds and securities were used by them to a large extent in the office of Nicholls & Company in gambling transactions.

Walter J. Nicholls & Company were ostensibly engaged in the stock brokerage business, but the manner in which their dealings with Milholland and Hough were conducted clearly establishes the fact that they were conducting, so far as the moneys in controversy in this suit are concerned, a bucket shop. The testimony clearly shows that, whereas Nicholls & Company pretended to buy, sell and option shares, stocks, bonds, grain and other commodities on margins and on credit, as a matter of fact, neither Nicholls nor Milholland and Hough had any intention of actually delivering or receiving and paying for the property pretended to be bought and sold, but they all intended that the transactions between them should be closed upon the basis of market prices quoted on some board of trade or stock exchange, and that the margins deposited at the time of the transactions between the parties were deposited to cover fluctuations in the prices on such boards and exchanges; that the intention was, and, as a matter of fact, the actual fact was, that these transactions were conducted through so-called "buy" and "sell" orders, which, on their face, purported to be sales or purchases by Milholland and Hough, but that upon Milholland and Hough later deciding to end the transaction, or if the margin deposited were not sufficient, a contrary order was entered by Milholland and Hough against the original purported sale or purchase, whereupon the transaction would be closed upon the books. If the change in prices upon the board or exchange showed a profit, the transaction being closed, such profit was paid to Milholland and Hough, or placed to their credit. This condition extended for a

period of about two years, until the time that Milholland committed suicide, and Hough was sent to the state penitentiary, as a result of the manipulations of Callahan's property.

No actual transfer, delivery or receipt of any of the stocks, bonds, grain or commodities which the parties were pretending to deliver ever took place. From the amounts paid by Milholland and Hough to Nicholls & Company commissions in the sum of $8,000 were retained by Nichols & Company, and the balance, so it is claimed, was used by Nicholls & Company with the firm of Logan and Bryan, stock exchange brokers in New York, it being the contention of the respondents that, as every one of the some one hundred and sixty transactions with Milholland and Hough occurred, immediately Nicholls & Company transmitted to Logan and Bryan a buy or sell order corresponding with the order placed by Milholland and Hough. This testimony tending to establish this contention we are taking into consideration, although its admission was strenuously objected to by the appellant and serious objections are raised to it, which need not be considered, for the reason that, even with this testimony in the case, the result that we are to reach is not affected.

The testimony does not show that Milholland and Hough ordered Nicholls & Company to transmit, or knew that company was transmitting, their orders to Logan and Bryan. In other words, there is no testimony that fairly establishes that Nicholls & Company were acting merely as the agents for the New York concern. Upon these facts the appellant brought this suit, seeking to recover from the respondents upon the theory that Milholland and Hough, by their criminal conduct, became trustees of the property deposited with them by Callahan, and that the transactions between Milholland and Hough and Nicholls & Company

being criminal, both at common law and under our statute, the trust funds received by Nicholls & Company from Milholland and Hough, having been unlawfully received, can be recovered from the former.

Considerable argument is indulged in by the respondents to establish that the business relationship between Milholland and Hough and Nicholls & Company was legitimate and not inhibited by our statutes or at common law. It is true that the hand is the hand of Esau, but the voice is the voice of Jacob. Although the form of legitimate trading was preserved, the fact is that the transactions were illegal. As the United States supreme court said in *Irwin v. Williar,* 110 U. S. 499:

"Gambling is none the less such because it is carried on in the form or guise of legitimate trade  .  .  .

"It might therefore be the case, that a series of transactions, such as that described in the present record, might present a succession of contracts, perfectly valid in form, but which on the face of the whole, taken together, and in connection with all the attending circumstances, might disclose indubitable evidences that they were mere wagers."

Says Page on Contracts (2d ed.), § 840:

"A form of wager often difficult to detect exists where an apparent contract of sale is made for future delivery, in which the parties do not intend to deliver the thing contracted for, but intend to settle the contract by paying and receiving the difference between the market price and the price agreed upon. Such a contract is really a bet or wager on the market price at the time fixed. Such contracts are said by some authorities to be void at common law, on grounds of public policy. Where wager contracts are invalid, no specific statute is necessary to make this class of contracts invalid."

The evidence shows that these marginal transactions contemplated the use by Milholland and Hough, if they

were legitimate, of millions of dollars, but that not one delivery of any kind of property purporting to be dealt in was made by either party to the other. At common law, such transactions were considered to be void as against public policy and were held to be gambling. *Irwin v. Williar, supra.* But under § 2475, Rem. Comp. Stat., these transactions are specifically made penal. That section reads:

"A bucket-shop is hereby defined to be a shed, tent, tenement, booth, building, float or vessel, or any part thereof, wherein may be made contracts respecting the purchase or sale upon margin or credit of any commodities, securities, or property or option for the purchase thereof, wherein both parties intend that such contract shall or may be terminated, closed and settled; either

"(1) Upon the basis of the market prices quoted or made on any board of trade or exchange upon which such commodities, securities or property may be dealt in; or,

"(2) When the market prices for such commodities, securities or property shall reach a certain figure in any such board of trade or exchange; or

"(3) On the basis of the difference in the market prices at which said commodities, securities or property are, or purport to be, bought and sold."

When, therefore, Milholland and Hough took trust funds in their possession and delivered them to Nicholls & Company for an illegal purpose, in which Nicholls & Company were participating, Nicholls & Company in turn became trustees for the amounts so received. Nicholls & Company were not innocent holders for value of the trust property and without notice, but were co-criminals, or, in any event, joint tort feasors, and, under such circumstances, the *cestui que trust* can proceed against the second trustee.

"If an unauthorized agent has expended his principal's money in an illegal transaction without his

principal's knowledge or approval, the principal cannot be said to be in pari delicto with the adversary party to such transaction; and, accordingly, such principal may recover from the adversary party the amount thus paid by such agent, as far as the principle of illegality is concerned. If A's agent, X, loses A's money at gambling, to B, A may recover such fund. One whose money has been taken by an agent without authority and deposited as margin in future gambling sales, may recover it in equity from such broker." (Page on Contracts (2d ed.), § 1098.)

See, also, 39 Cyc. 567, and the numerous cases cited in those two works on this point. Oliver v. Piatt, 3 How. (U. S.) 333.

This doctrine has been applied directly to cases involving a situation very similar to this one. *Central Stock & Grain Exchange of Chicago v. Bendinger*, 109 Fed. 926; *Joslyn v. Downing Hopkins & Co.*, 150 Fed. 317; *Beidler & Robinson Lum. Co. v. Coe Commission Co.*, 13 N. D. 639, 102 N. W. 880; *Becker v. Fitch*, 66 Okl. 57, 167 Pac. 202; *Pearce v. Dill*, 149 Ind. 136, 48 N. E. 788.

We come now to the question whether Nicholls & Company have so dealt with the trust funds reaching their hands that they are not liable to their *cestui que trust*.

Their claim of nonliability rests upon a fact, which they attempted to show, that the moneys received by them from Milholland and Hough, with the exception of the commissions which they retained, were sent to Logan and Bryan and there placed to the credit of Nicholls & Company. In *Friedman v. Branner*, 72 Wash. 338, 130 Pac. 360, a constructive trustee was held to be liable for the value of goods which he had sold and converted to his own use, this court saying:

". . . the goods attempted to be disposed of by the sale remained the goods of the vendor, and as such

in the hands of the vendee were to be regarded as a trust fund, and the vendee the trustee for the benefit of the creditors of the vendor. . . . And, since he was wrongfully in possession of the property or its equivalent, Sullivan stands as does any other person who has wrongfully converted property to his use. He cannot say the remedy of those entitled to the property is against the property itself only; but must respond in damages for its conversion. It is, we think, well established that, when a trustee such as Sullivan was in legal contemplation, in violation of his trust disposes of the trust property, he is personally liable. . . ."

A trustee *de son tort* does not escape liability to his *cestui que trust* by showing that he has disposed of the property, the subject of the trust. It may be that such disposition has placed the property in the hands of a *bona fide* purchaser for value without notice, and the *cestui* cannot impress the trust upon the property in the hands of the ultimate holder of it; but, at the same time, the trustee *de son tort* is personally liable for the value of the property of the *cestui* which he has had in his possession, for he has converted the trust property, and although the *cestui* may not be able to follow the specific property and impress a trust upon it, he is nevertheless entitled to a judgment against the wrongdoing trustee. *Central Stock & Grain Exchange of Chicago v. Bendinger, supra; McMichael v. Mason*, 13 Pa. St. 213; *Higgins v. Whitney*, 24 Wend. (N. Y.) 379; *Otis v. Jones*, 21 Wend. (N. Y.) 394; *Riggs v. Palmer*, 115 N. Y. 506, 22 N. E. 188, 12 Am. St. 819, 5 L. R. A. 340.

Apparently recognizing the soundness of this position, the respondents seek to escape liability upon the ground that they were merely acting as agents of Milholland and Hough in sending the moneys to Logan and Bryan. One answer to this argument is that

Milholland and Hough knew nothing of Logan and Bryan and that the money received by the latter was credited to the Nicholls concern.    Another answer is that Nicholls & Company (and this fact is material not only here, but in considering the discussion we have hereinabove made on another point), knowing the financial condition of Milholland and Hough, are charged with the knowledge that Milholland and Hough were not using their own moneys, and that, even assuming Milholland and Hough were employing Nicholls & Company as an agency for the transaction of business with Logan and Bryan still, the whole transaction being an illegal one, there could, as a matter of fact, be no agency, because the law recognizes no agency created for the purpose of violating law.  3 C. J. 413. In dealing with the bucket-shop cases, the supreme court of Illinois said:

"The suggestion that Hooker & Co. merely acted as agents for plaintiff in these unlawful transactions, may be rejected at once as having nothing in its support.    There is and can be no such thing as agency in the perpetration of crimes or misdemeanors, or, indeed, in the doing of any unlawful act.    All persons actively participating are principals."  *(Pearce v. Foote,* 113 Ill. 228.)

See, also, *Ruchisky v. De Haven,* 97 Pa. St. 202, and *Norton v. Blinn,* 39 Ohio St. 145, in which latter it is said:

"In offences against trade, and the like, the law regulating the administration of penal justice, does not recognize the relation of principal and agent, unless the agent be an innocent instrument merely.    In such cases the guilty offenders against the law are all principals; hence, as between such, with some show of reason it might be said, that the law will afford no redress by civil remedies."

See, too, *Lester v. Buel,* 49 Ohio St. 240, 30 N. E. 821, 34 Am. St. 556; *Jamieson v. Wallace,* 167 Ill. 388, 47 N. E. 762, 59 Am. St. 302; *Lamson v. West,* 201 Ill. App. 251; *Carey v. Myers,* 92 Kan. 493, 141 Pac. 602.

Moreover, another answer is available to this contention, which is stated by Judge Cooley in *Gregory v. Wendell,* 40 Mich. 432:

"No doubt the transaction may assume such a phase that the broker must be regarded as an agent merely. If he merely makes the purchase with the understanding, expressed or implied, that the contract is to be at once turned over to his principal, and this is done with the knowledge and consent of the seller, the broker's connection with the transaction will then have ceased, and if his commissions are paid, the principal will no longer have claims upon him in respect to it, nor he upon the principal. The buyer and seller will then be relieved of intermediate parties and must look to each other exclusively for the performance of their respective obligations. And no reason is perceived why, at the election of the purchaser, the transaction may not be made to assume this form in every instance. As a matter of course in such case, the seller, when turned over to a purchaser who may be unknown to him, would be entitled to demand full payment at once, or to be protected by payments as 'margins' or otherwise, in ways that he might not have required of the broker through whom the transaction was effected; but if payment is made or the demanded protection given, he cannot object to being turned over to the purchaser himself as the person with whom he must subsequently deal.

"But this is not the phase the transaction commonly assumes. The dealings are generally left in the hands of the broker himself until the transaction is fully closed, and we hazard nothing in saying that under such circumstances the buyer and the seller never had an understanding that they are to look to each other as the responsible parties, and not to the intermediate brokers. The buyer in the interior of Michigan

knows nothing about the broker in Chicago, and does not trouble himself with the question of his responsibility. He goes to his own broker, in whose responsibility he has confidence, and deals with him, expecting that he will see to the closing up of all transactions.

"If a buyer for future delivery must be understood as dealing with the party who sold to his broker's correspondent, then defendants were consistent and logical in insisting, after Wendall & Co. had sold the July contracts without orders, that no other contracts could be substituted for those so disposed of. No man can be compelled against his will to accept another contracting party in place of the one he has dealt with, even though a contract with such other party may be equally valuable, and in its results exactly the same."

Neither does the record impress us any too strongly that the transactions between Nicholls & Company and Logan and Bryan were not more gambling than legitimate transactions. Nicholls was not offered as a witness, and this fact properly gives rise to an inference that if he had been called and had testified to the truth his contention would not have been aided thereby. 22 C. J. 121.

Reference is made to the fact that the New York Stock Exchange, where Logan and Bryan were dealing, was a legitimate institution, but experience teaches us that many lawful and even laudable enterprizes may at times be made the instrumentalities of illegal and reprehensible dealings. Many cases are cited by the respondents which establish the fact that selling stocks on margin is a lawful transaction, and that the contract for the purchase and sale of commodities not yet grown or produced is not invalid. But, as we have already attempted to show, the real transactions between the parties here were not the buying and selling of stock on margin or the dealing in commodity futures, and those authorities are therefore aside from the question.

The question then remains as to what judgment the appellant is entitled to. Respondents having admitted receiving $8,000, which was retained under the guise of commissions, this fund is still in the respondents' possession as part of the trust fund belonging to the appellant, and the appellant is entitled to have that amount in the hands of the assignee declared to be held by the assignee in trust for the appellant. And this is true even though the respondents claim that, through the giving to them by Milholland and Hough of approximately $17,000 worth of checks which were dishonored, they have suffered a loss in their transactions with Milholland and Hough, and, not having profited, are therefore not liable. The error in this contention, of course, is that all these transactions between Milholland and Hough and Nicholls & Company being illegal, Nicholls & Company cannot say, because they did not profit by them, that they are not accountable for the actual trust funds reaching their hands.

The remaining Callahan trust funds transferred to Nicholls & Company by Milholland and Hough, not being in the hands of Nicholls & Company so that a trust may be impressed upon them, the appellant is only entitled to a judgment for the amount of such funds, and the evidence disclosing that there was delivered a total amount of $373,849.05, there must be deducted therefrom the sum of $8,000, which would constitute a perferred claim, as we have indicated, and there must also be deducted the further sum of $165,000, which the testimony shows was handled in this manner: Checks in that amount were drawn on a bank in New York by Milholland and Hough, to the order of Nicholls & Company, and endorsed by Nicholls & Company and at the direction of Milholland and Hough and deposited with Logan and Bryan. The transactions involving this amount were transactions such that we do not

feel that Nicholls & Company had such part in as to entitle us to say that they became trustees for these funds. Making these deductions, there is a balance of $202,849.05, judgment for which the appellant is entitled to receive, and this judgment will take rank with the other claims proved against the estate of Nicholls & Company in the hands of the assignee.

Judgment reversed.

MAIN, C. J., BRIDGES, HOLCOMB, and MITCHELL, JJ., concur.