[No. 29169. Department One. March 17, 1944.]

R. D. WALKER, *Appellant*, v. JOE HERKE *et al.,* *Respondents.*[1]

240

*Rigg, Brown & Halverson,* for appellant.

*Harcourt M. Taylor,* for respondents.

JEFFERS, J.—This action was brought by R. D. Walker against Joe Herke, John A. Herke, and Gertrude Herke, copartners doing business as Herke Bros., to recover the value of thirty-six steers which it is alleged were sold by defendants to plaintiff for immediate delivery, and which defendants refused to deliver.

Defendants by their answer denied the allegations of the complaint, except that they were a copartnership, alleging affirmatively that on January 29, 1943, the parties entered into a verbal agreement, by which defendants agreed to sell plaintiff thirty-six head of steers, which were located in a feed lot about twenty-five miles from defendants' home; that, at the time the agreement was made, plaintiff delivered to defendants his check for $4,700, which has never been cashed. It is further alleged that it was agreed that plaintiff would accept delivery of the steers at the feed lot where they were at that time, and that it was further agreed that plaintiff would notify defendants when he would be at the feed lot to take delivery; that plaintiff, without notifying defendants, went to the feed lot on Monday morning following the sale on Friday, and after his arrival called defendants; that defendant Joe Herke went to the feed lot Monday afternoon to make delivery, but plaintiff had left. It is further alleged that Tuesday after-

noon, February 2nd, defendant Joe Herke was at the feed lot, ready and willing to deliver the steers, and plaintiff was there but refused to accept delivery of the steers without legal excuse, whereupon Joe Herke informed plaintiff he would either have to take the steers or take his money back, and that, if he did not take the steers at that time, defendants would not hold them any longer for him. It is further alleged that plaintiff then stated he would not accept the steers unless defendants would pay his attorney's fees and the money he was out for trucks to remove the steers, which defendants refused to do.

Plaintiff by his reply denied the affirmative matter contained in the answer.

The cause came on for hearing before the court, which thereafter made and entered its findings of fact, conclusions of law, and judgment in favor of defendants. Plaintiff has appealed from the judgment entered May 14, 1943.

It is appellant's contention that the court erred (1) in permitting respondent Joe Herke and the witness Wetch to testify as to the contents of a certain written memorandum given by Herke to Wetch, and by the latter shown to appellant; (2) in holding that appellant breached the contract by not accepting delivery at the feed lot on February 2nd; (3) in holding that there had been a tender of delivery by respondents to appellant on February 2nd; and (4) in not holding that title to the cattle had passed to Wetch under the sale in December, 1942, and that respondents could make no effective tender of delivery thereafter.

Respondents were copartners, doing business as Herke Bros. On Friday, January 29, 1943, respondents were the owners of thirty-six head of steers which were kept in a feed lot about twenty-five miles from respondents' residence. Adjoining this feed lot was one owned by Joe Wetch. This latter yard had scales, chute, and facilities for loading cattle into trucks. The trial court found, and the evidence sustains the finding, that, at the time appellant bargained for the cattle, nothing was said about when title should pass, but it was agreed that delivery would be made to appellant early in the following week at the

feed yard where the cattle were located. Appellant then gave to respondents his check for $4,700, the agreed purchase price of the steers.

The trial court further·found, and the testimony sustains the finding, that some time between Friday, January 29th, and the following Tuesday, certain telephone conversations took place between appellant and Joe Herke, one of the partners, in which appellant was informed that respondents were not going to deliver the steers to him, and offered to return appellant's check. Appellant insisted that he was entitled to have the steers delivered to him as agreed, and refused to accept the return of the check.

Appellant's testimony further shows that, notwithstanding the telephone conversations, which we think took place on Saturday and Sunday, appellant went to the feed yard on Monday morning to take the cattle, but found the gates to the feed lot locked, and, as there was no one there to open them, he was unable to take the steers. According to appellant's testimony, when he found no one at the feed yard Monday morning, he called Joe Herke on the telephone, and told him he was there to receive the cattle, stating that he (Joe Herke) had better come down, and that he (appellant) had bought the cattle and was going to take them; but Joe told him not to touch the cattle and then hung up on him.

In regard to this particular conversation, Joe Herke testified that it had been agreed that appellant would notify them when he was ready to take delivery of the cattle, and that appellant did not notify them that he would be at the feed yard Monday to accept delivery. Herke also testified that, when appellant called him Monday morning, all he (Herke) said was to leave the cattle alone until he got there; that he went to the feed lot Monday afternoon to deliver the cattle, but appellant had left. It.appears from the testimony of Joe Herke that, after the conversation with appellant on Sunday, when Herke told appellant he could not have the cattle, Joe talked with his brother, and they decided to let appellant have the cattle.

It further appears that, probably as the result of a telephone conversation, Joe Herke and appellant met at the feed yard Tuesday afternoon, at which time Herke told appellant to take the cattle. This, appellant refused to do, unless respondents would pay certain legal expense and truck expense claimed to have been incurred by appellant as the result of respondents' refusal to deliver the cattle. Respondents refused to pay this claimed expense if appellant took the cattle, although respondents agreed to pay any claimed incidental expense if appellant would not take the cattle. Herke and appellant were unable to reach an agreement, with the result that negotiations terminated and this suit was started.

While appellant was at the feed yard on Tuesday, Joe Wetch, to whom we have heretofore referred, showed appellant a receipt for one hundred dollars, signed by Joe Herke, which amount Wetch claimed he had paid down on the purchase price of the thirty-six head of steers. This receipt was apparently given on December 1st. Wetch claimed some interest in the steers, stating that, if they went into his lot to be loaded, he would claim them. Wetch testified, however, that, if appellant wanted to take the steers out of the lot in some manner other than through Wetch's lot, there was nothing he could do to prevent it. There were two gates by which the cattle could be taken from the feed lot without going through Wetch's lot.

Appellant denied that a tender of the cattle was ever made to him.

Based upon the above and other testimony, including an admission by appellant that he was willing to take the cattle on Tuesday, regardless of Wetch's claim, if delivery had been tendered by respondents, the trial court made the following finding with respect to what transpired on Tuesday:

"That on the following Tuesday the plaintiff and the defendant, Joseph Herke, met at the said feed lot where the steers were, and the plaintiff refused to accept delivery of said steers unless the defendants paid him for the expenses which he claimed he had been put to on account

of said prior refusal to deliver said steers, and the defendant, Joseph Herke, offered to deliver said steers to the plaintiff then and there in performance of said contract, and the plaintiff refused to accept delivery of said steers."

From its findings of fact, the trial court concluded that appellant himself had breached the contract on Tuesday; that the anticipatory breach attributed to respondents had never been accepted by appellant; and that appellant was not entitled to recover from respondents.

We are of the opinion that appellant's first assignment of error is not well taken, for several reasons. It will be remembered there was nothing in the pleadings in regard to any previous sale of the steers to Joe Wetch, nor is there any allegation in regard to respondents' inability to give good title. Joe Herke was the first witness called by appellant, and during his examination an attempt was made to interrogate him relative to a sale of the cattle to Wetch, but an objection to that evidence was made and sustained. On redirect examination of Joe Herke, appellant again asked him the following questions:

"Q. Who was there Tuesday afternoon besides you and Mr. Walker? A. Mr. Wetch and myself and Mr. Walker. Q. Mr. Wetch, you say? A. Mr. Wetch was there. Q. Mr. Wetch had already bought these cattle? A. No. Q. Hadn't he paid you $100 down on them? A. Well, he paid me $100 — Q. Now you answer questions. A. —on December 1st. Q. On December 1st, he paid you $100 down? A. Paid me $100. Give him the last chance on the cattle like I would anybody. Q. Have you got that receipt? A. No, I haven't got it, never seen it since I let Mr. Wetch have it."

The testimony last above set out was admitted without objection. Appellant was also interrogated about the sale to Wetch.

■ In the first place, if error was committed by the trial court in allowing respondents' witnesses Wetch and Joe Herke to testify as to the contents of the receipt or memorandum, it was invited error. Respondents made no effort to examine any witness in regard to the receipt or memorandum until after appellant had interrogated

witnesses about it. In the second place, we are of the opinion the testimony of both Wetch and Herke was so vague and indefinite as to the contents of that instrument, that their testimony could not have been prejudicial. Mr. Wetch was interrogated by counsel for respondents as follows:

"Q. Well, there was a little memorandum of some kind? A. Yes. That was after Mr. Herke come that I showed it. Q. That was after? A. That was after Mr. Herke got there. Q. That was after Mr. Herke got there? A. Yes. Q. What became of that memorandum? A. I don't know; I think I destroyed it. Mr. Herke asked me for it two or three times and I didn't have it with me, and so one day I just destroyed it. Q. Do you recollect how it was worded? A. No, I don't. Q. You have no recollection of how it was worded? A. Well, it was a receipt for 36 steers and $100 paid down on them, to be weighed. Q. What is that? A. I think to be weighed or something; I don't remember just what— Q. Did you hear Mr. Herke's version of this deal he made with you when he was on the witness stand, that really that memorandum was just something that gave you a last chance on the buying of these steers? A. Yes; there was a verbal agreement to that effect, and—"

Mr. Brown, attorney for appellant, here interposed an objection, which was overruled. The objection was to the effect that the evidence showed the memorandum was destroyed at the request of respondents after the institution of this suit, and that respondents therefore could not show the contents of the instrument. The objection was overruled, and the witness was further interrogated:

"Q. You have given us your best recollection of what was in this, have you? A. Yes, I have. I couldn't tell you what was in it just exactly. It was something to that effect. . . . Q. Did this paper describe these steers in any way? A. No."

On cross-examination of Mr. Wetch by counsel for appellant, the witness further testified:

"Q. Mr. Wetch, getting back to this contract that you had, wasn't it on one of your regular order forms? A. That's right. Q. Described 36 steers. Did it say where they were located—at the Herke ranch in the Ahtanum or

the feed lot? A. I couldn't say; I don't believe there was any description on there."

Mr. Wetch testified as follows concerning the destruction of this memorandum:

"Q. When Herke asked you to destroy this paper or return it to him, was there anything said about the fact that Mr. Walker had sued him? A. No; nothing said."

Joe Herke's testimony as to the contents of the receipt was just as indefinite as Wetch's.

In addition to what has been said, we are of the opinion it is very doubtful if the testimony shows that the memorandum was destroyed so that it could not be made available at the trial. It will be remembered that appellant himself had seen the receipt, which fact Herke knew.

We shall next discuss appellant's fourth assignment of error, which is to the effect that the court erred in not holding that title to the cattle passed to Wetch on December 1st, the date of the memorandum. Appellant states in his brief that the rule is that not only will a party or witness not be permitted to testify as to the contents of a written instrument destroyed or spoiled by him or at his direction, but the conclusive presumption, once it has been established that such an instrument exists, is that it would tend to disprove the contention of the person at whose direction the spoliation occurred, and prove the contention of his opponent.

The following sections in 2 Wigmore on Evidence (3d ed.) deal with the rule contended for by appellant:

"§ 278. It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not apply itself necessarily to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause."

"§ 285. The consciousness indicated by conduct may be, not an indefinite one affecting the weakness of the cause at large, but a specific one concerning the defects of a *particular element* in the cause. The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party. These inferences, to be sure, cannot fairly be made except upon certain conditions; and they are also open always to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure. But the propriety of such an inference in general is not doubted."

"§ 291. . . . The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor, *provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one* as to whose contents it is desired to draw an inference."

Earlier in the section last above referred to, Mr. Wigmore points out that this rule does not give rise to a presumption of law operating to shift the burden of proof, but this rule merely permits the jury to draw an inference from the fact of nonproduction or spoliation; namely, that the contents of the document, if produced, would be unfavorable to the spoliator. The effect of this inference is discussed in Jones Commentaries on Evidence (2d ed.), vol. 1, p. 148, § 87, as follows:

"In some cases it has been contended that when spoliation is once shown, it should be assumed that the contents of the documents are as alleged by the opposite party. But it may well be questioned whether the presumption should be carried to this extent. Doubtless the wrongful act is a circumstance from which the jury may draw the most unfavorable inference against the wrongdoer. Such act may throw suspicion on all the other evidence produced. by him. And it may prevent him from proving the con-

tents of the documents destroyed by any other evidence. But the presumption arising from such acts does not entirely dispense with proof by the adverse party."

The aspect of this problem which has been most often before this court is that of the failure to call witnesses who, presumably, if called, would testify unfavorably to the party failing to call them. See *Glasgow v. Nicholls,* 124 Wash. 281, 214 Pac. 165, 35 A. L. R. 419; *Lenover v. Beckman,* 142 Wash. 98, 252 Pac. 533; *Gardner v. Herbert,* 165 Wash. 429, 5 P. (2d) 782; *Warren v. Bowdish,* 166 Wash. 217, 6 P. (2d) 593; *Bond v. Werley,* 175 Wash. 659, 28 P. (2d) 318; *Yakima First Nat. Bank v. Pettibone,* 182 Wash. 663, 47 P. (2d) 997; and *Wright v. Safeway Stores,* 7 Wn. (2d) 341, 109 P. (2d) 542, 135 A. L. R. 1367.

In applying the principles laid down in the cited cases, we shall assume, for the sake of this argument only, that the memorandum in question was destroyed at the instance of Joe Herke, with a deliberate design to prevent its introduction in evidence.

■ This action was tried to the court; hence, we must assume that the trial court considered only evidence which was relevant, competent, and probative.

Appellant argues that the rule as to destruction of memoranda is precisely the same as the rule well recognized by all courts, including this court, that, when a party does not take the stand, or has witnesses available who are not called, the *conclusive presumption* is that his testimony would be prejudicial to him, citing *Yakima First Nat. Bank v. Pettibone, supra.* We do not believe this court has ever gone as far as indicated by the above contention. We stated in the cited case:

"None of the appellants testified, and, as stated by this court in the case of *Bank of Chewelah v. Carter,* 165 Wash. 663, 5 P. (2d) 1029, this fact, without explanation, fairly gives rise to the inference that their testimony would neither have supported their pleaded denials of the allegations contained in the respondent's complaint nor tended to disprove the evidence offered by respondent."

■■ It seems to us, in the first place, that appellant mistakes the proper application of the rule here. It will be remembered that the pleadings in no way raise the issue of any prior sale of the cattle. This issue was injected into the case by appellant for the purpose of showing that respondents, having, as appellant claimed, made a prior sale of their cattle, as the result of which title had passed to Wetch on December 1st, could make no legal tender of the cattle to appellant. The burden was on appellant of proving such a sale, and that title passed. It was not enough, to sustain appellant's contention, that he show a spoliation of the memorandum which he contends evidenced such sale. Such spoliation creates an inference to be considered in weighing the effect of the evidence applicable to the question in dispute. The effect of such spoliation is persuasive rather than probative, and cannot be invoked as substantive proof of any fact essential to appellant's case, certainly not where, as in this case, secondary evidence was obtainable to prove the fact.

Giving full weight to the inference that the contents of the memorandum would, if disclosed, be adverse to respondents' contention, we are of the opinion there is no substantial testimony to support appellant's contention that title to the steers passed on December 1st.

The following statement is found in 70 A. L. R. 1326:

"It has become a well-established rule that, where evidence which would properly be a part of a case is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to do so, the jury may draw an inference that it would be unfavorable to him.

"The rule has been stated that the presumption will not supply a missing link in an adversary's case, and cannot be treated as independent evidence of a fact otherwise unproved.

"And it has been stated that the presumption arising from the nonproduction of evidence does not relieve the other party from the burden of proving his case."

In *Stocker v. Boston & M. R.*, 84 N. H. 377, 151 Atl. 457, 70 A. L. R. 1320, the rule is stated as follows:

"The conduct of a party in failing to produce an absent witness may under some circumstances, give rise to an inference that the witness if called would not have been favorable to such party. But in that case evidence of such conduct is persuasive rather than probative, and cannot be invoked as substantive proof of any facts essential to the case of his opponent."

*In re Kelly's Estate,* 150 Ore. 598, 46 P. (2d) 84, cited by appellant, the rule is stated as follows:

"Let us not lose sight of the fact that much valuable evidence has been destroyed by Mrs. Northrop. The destruction of evidence, when unsatisfactorily explained, warrants an inference that the documents were unfavorable to the person who destroyed them. Some of these letters, and especially Kelly's letter to her which she also destroyed, surely would have supported her claim if the facts were as she alleges.

"In cases of this character the courts frequently dwell upon the unlikelihood of direct evidence of the wrongful act being available, especially if the wrongdoer was cunning, crafty and secluded his victim."

We have no fault to find with the rule as above stated, or as applied in the cited case, but we must take cognizance of the effect of such inference, as stated in *Patch Mfg. Co. v. Protection Lodge,* 77 Vt. 294, 60 Atl. 74, 107 Am. St. 765:

"The rule of law governing this question was substantially complied with, which is, that the presumption arising from the fact of spoliation of evidence does not relieve the other party from introducing evidence tending affirmatively to prove his case so far as he has the burden. It cannot supersede the necessity of other evidence. The presumption is regarded as merely matter of inference in weighing the effect of evidence in its nature applicable to the question in dispute."

In the case of *Eldridge v. Terry & Tench Co.,* 145 App. Div. 560, 129 N. Y. Supp. 865, it is stated:

"The presumption which arises from a failure to produce a witness under one's control who is shown to have knowledge of the circumstances of a material question, does not supply an entire lack of proof on the part of the opposing party, but goes only to corroborate proof already given which constitutes a *prima facie* case."

In *Davis v. Etter & Curtis*, 243 S. W. (Tex. Civ. App.) 603, the court sums up the rule in the following words:

"The presumption arising from the withholding or suppression of evidence by one party will not wholly relieve the adverse party from proving his case; but such suppression may be taken as a strong circumstance, in connection with others proved, in arriving at a verdict and judgment."

It may be admitted there is authority for the rule that the presumption arising from the fact of spoliation supplies the missing proof of the contents of the document. This rule is illustrated by the case of *Middleton v. Middleton*, 188 Ark. 1022, 68 S. W. (2d) 1003, cited by appellant.

While we are of the opinion the weight of authority is in accord with the cases cited herein prior to the *Middleton* case, *supra*, there are, in our opinion, good and sufficient reasons why even the rule of the *Middleton* case would not operate in the instant case to prove title in Wetch. The memorandum which was destroyed was not the only evidence available to prove this fact. Its destruction did not remove all evidence of a prior sale of the steers, if such a sale was in fact made. There remained to be considered the fact of possession of the cattle by respondents, and the testimony of the purported vendee, Wetch. Appellant also saw the memorandum, and was in as good a position as anyone to testify to its contents. In other words, there was ample opportunity for appellant, by secondary evidence, to prove the contents of the memorandum. All he said concerning it was that it was a receipt for one hundred dollars paid "for these supposedly 36 steers that was dated in December," with Joe Herke's signature on it. No one testified it was, or purported to be, a bill of sale. There was no evidence tending to show when the parties to that purported sale intended title to pass. Appellant, who saw the memorandum, did not testify that it was such an instrument as would operate, in and of itself, to pass title to the cattle to Wetch.

We are of the opinion, therefore, that the trial court, in determining whether or not title passed to Wetch on December 1st, was entitled to consider the fact of spoliation

in conjunction with all of appellant's evidence surrounding the transaction.

The trial court apparently did not believe that the secondary evidence introduced as to the contents of the memorandum was sufficient to show that by virtue of the memorandum title passed on December 1st, and so, granting full indulgence to the inference from the fact of spoliation, the trial court was certainly not bound to find that title passed to Wetch on December 1st.

We are also of the opinion that the secondary evidence, when considered in connection with the inference from the fact of spoliation, was not sufficient to show that title passed to Wetch on December 1st.

We think it should be noted here that, in reading the testimony in this case, we are impressed with the tendency of both appellant and Joe Herke to give evasive and contradictory answers. Much of the testimony was conflicting, and in such a case this court is loath to overturn any finding of the trial court on a question of fact.

It is apparent to us that appellant did not seriously consider Wetch's claim, as appellant testified he was willing to take the cattle if respondents would pay the expense hereinbefore referred to, even after he was informed by Wetch of the memorandum.

We now come to the last question presented: Did the trial court err in holding as a matter of law that the contract between appellant and respondents was breached by appellant on Tuesday, February 2nd?

The trial court found that appellant refused to accept the cattle when offered to him on the date last mentioned, unless respondents would pay certain attorney's fees and trucking costs. There is ample evidence to support this finding. From this, the court concluded that appellant should take nothing by this action. The theory of the trial court was that, when respondents stated they would not deliver the steers to appellant, he then had the option of treating the contract as anticipatorily breached, or refuse to accept the repudiation by respondents, and treat the con-

tract as still in effect. Appellant pursued the latter course. He repeatedly urged respondents to deliver, as agreed. On Monday morning, after being informed by respondents that he could not have the cattle, appellant went to the feed yard for the purpose of getting them, and undoubtedly would have taken them had he not found the gates locked. Because of these demands by appellant, and apparently after discussing the matter further among themselves, respondents retracted their repudiation, and tendered delivery to appellant on Tuesday, February 2nd.

We agree with the trial court that, under the facts of this case and the law applicable thereto, appellant's refusal to take delivery on Tuesday, when he was told to take the cattle, constituted a breach of the contract on his part, and that he should take nothing by this action.

It is undoubtedly true that respondent's refusal might have been treated by appellant as an anticipatory breach of contract. Restatement of the Law of Contracts, § 318, defines anticipatory breach as follows:

" . . . Any of the following acts, done without justification by a promisor in a contract . . . constitutes an anticipatory repudiation which is a total breach of contract:

"(a) a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties."

Respondents later retracted their refusal, and offered to perform in accordance with the terms of their contract. Section 319, id., states:

"The effect of repudiation is nullified (a) where statements constituting such a repudiation are withdrawn by information to that effect given by the repudiator to the injured party before he has brought an action on the breach or has otherwise materially changed his position in reliance on them."

We are of the opinion that, when the parties met at the feed lot, the agreed place of delivery, on Tuesday, February 2nd, the contract was in full force and effect, respondents

being bound to tender delivery, and appellant being bound to accept.

In 12 Am. Jur., under the general heading of Contracts, appear the following in regard to renunciation of a contract:

§ 392: "A majority of the courts have reached the conclusion that a renunciation of a contract before the time for performance, which amounts to a refusal to perform it at any time, gives the adverse party the option to treat the entire contract as broken and to sue immediately for damages as for a total breach."

§ 393: "In order to justify the adverse party in treating the renunciation as a total breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and it must be distinct, unequivocal, and absolute."

§ 395: "Where one party has repudiated an executory contract, the adverse party has an election to treat the contract as broken or not so to treat it.. The refusal to perform must be treated and acted on as a distinct and unequivocal absolute refusal to perform the promise. It is commonly said that there is no breach or that the repudiation does not operate as a breach until such repudiation is treated as a breach by the other party. . . . "

"The right of election of the injured party arising from the repudiation is lost upon a withdrawal of the repudiation under certain circumstances."

§ 398: "The *locus poenitentiae* is kept open until the injured party elects to treat the contract as abandoned by the other party and brings action as for nonperformance."

For the reasons herein assigned, the judgment of the trial court is affirmed.

SIMPSON, C. J., BEALS, BLAKE, and STEINERT, JJ., concur.