(No. 16694.—Judgment affirmed.)
HOWARD WHITE, Trustee, Defendant in Error, *vs.* THE
TURNER-HUDNUT COMPANY, Plaintiff in Error.

*Opinion filed June 16, 1926.*

1. BROKERS—*contracts for purchase and sale of grain are void
where no delivery is intended.* All transactions in grain or other
commodities are gambling transactions within the meaning of sec-
tion 130 of the Criminal Code, and are void if it is the understand-
ing between the parties that no deliveries are to be actually made
but that the purchases or sales are to be adjusted by the mere set-
tlement of the differences in prices.

2. SAME—*when section 132 of the Criminal Code, limiting time
within which action may be brought to recover gaming loss, does
not apply.* Section 132 of the Criminal Code, allowing six months
for bringing an action to recover money lost in a gambling trans-
action, does not apply where the suit is brought by an elevator com-
pany to recover an indebtedness arising out of the sale and actual
delivery of grain to a commission firm, for which the latter has
refused payment on the ground that the amount sued for was lost
by the manager of the elevator company in his dealings in futures.

3. SAME—*when rules of Chicago Board of Trade are imma-
terial.* Where the defendant, a commission firm, attempts to set off
against a suit for the price of grain sold and delivered an equal
sum lost by the plaintiff's manager in dealing in futures, the rules
of the Chicago Board of Trade providing for the delivery of grain
bought and sold on that board are immaterial and may be excluded
from the evidence, where it is proved that said rules were not fol-
lowed by the parties and that no grain was delivered or intended
to be delivered in the transactions in futures.

4. ACCOUNTING—*illegal claim cannot support payment by an-
other medium.* A claim which is void by reason of its illegality will
not support an account stated or payment by or through some
other medium.

5. STATUTES—*statutes of limitation will be strictly construed.*
Statutes of limitation are restrictive and will not be extended to
cases other than those for which express provision is made.

WRIT OF ERROR to the Appellate Court for the Second
District;—heard in that court on appeal from the Circuit
Court of Peoria county; the Hon. JOHN M. NIEHAUS,
Judge, presiding.

HUNTER, PAGE & KAVANAGH, and E. D. McLAUGHLIN, for plaintiff in error.

DAILEY, MILLER, McCORMICK & RADLEY, and JOSEPH W. MAPLE, (RICHARD H. RADLEY, of counsel,) for defendant in error.

Mr. JUSTICE DeYOUNG delivered the opinion of the court:

The Glasford Banner Farmers' Elevators, a corporation, instituted a suit in assumpsit in the circuit court of Peoria county against the Turner-Hudnut Company, a corporation, to recover a balance due for grain sold and delivered. The declaration consisted of the common counts, supplemented by a bill of particulars. Pleas of the general issue and payment were filed to the declaration. Two replications to the plea of payment followed. The first denied payment, and the second averred that the payments alleged to have been made consisted of charges against the plaintiff which arose out of speculations on the market price of grain; that in these transactions it was not intended that grain should be received or delivered but that both parties purposed that the resulting gains or losses should be settled by the payment or receipt of the differences between the market prices, and that the charges so made against the plaintiff were void. The defendant interposed a general and special demurrer to the plaintiff's second replication. The demurrer was overruled and leave was given the defendant to file a double rejoinder to the second replication. The first rejoinder denied that the transactions for which credit was taken by the defendant were gambling transactions, and the second averred that the suit was commenced more than six months after a complete accounting had been had between the parties; that on the accounting the plaintiff was found to be indebted to the defendant on account of the transactions mentioned in

the second replication in a sum equal to the plaintiff's demand; that the plaintiff canceled and released its demand to the defendant, and by such cancellation and release the plaintiff paid the defendant all sums due and owing to it, and that the suit was not instituted within six months from the time of such payment. The plaintiff filed a demurrer to the second rejoinder. The demurrer was sustained and the defendant elected to abide by its second rejoinder. During the pendency of the suit the plaintiff was declared a bankrupt, and Howard White, its trustee in bankruptcy, was substituted as plaintiff. A trial without a jury resulted in a judgment for the plaintiff for $7450.91 and costs. The defendant prosecuted an appeal to the Appellate Court for the Second District and the judgment was affirmed by that court. On petition of the Turner-Hudnut Company this court granted a writ of *certiorari,* and the cause is here for a further review.

The Glasford Banner Farmers' Elevators was largely owned by farmers in the vicinity of Glasford, in Peoria county, and began the business of buying and selling grain about July 1, 1919. The corporation owned three elevators: one of 10,000 bushels capacity in Glasford, equipped for loading grain into railroad cars; another of approximately 20,000 bushels capacity at Bell Landing, on the Illinois river, equipped for loading grain into boats; and a third at Mackey Landing, on the same river, which elevator, because of faulty construction, was used only a short time. The Elevators company purchased grain from farmers in the vicinity of its elevators and sold and delivered the grain through commission houses. The Turner-Hudnut Company is engaged in the commission grain business at Peoria, and, among others, operates the cash grain and futures departments. Grain handled through the first department was received by the Turner-Hudnut Company, sold on commission and accounted for to the shipper. The

futures department was equipped with tickers, and a black-board for the posting of market quotations. In that department deals were made by telegraph through agents, who bought and sold grain on the Chicago Board of Trade. Transactions in cash grain and futures were kept separately on its books. It was a stockholder in the Elevators company and was familiar with the latter's facilities and methods of conducting business. From October 7, 1919, to June 16, 1920, the Elevators company sold and delivered grain to the Turner-Hudnut Company through the latter's cash grain department. When the grain was delivered a statement was rendered to the Elevators company, from which its manager made entries in its books showing the date, grade, number of bushels, prices at which sold, net proceeds, and other details concerning the shipment. Forty-two of these statements, or "account sales," as they were called, were received by the Elevators company from the Turner-Hudnut Company and were introduced in evidence. Remittances were made from time to time, and it appeared from the records of the Elevators company that on November 19, 1920, the Turner-Hudnut Company's indebtedness to it for grain sold and delivered was $7450.91.

During the period that the cash grain sales were made, Lester A. Lightbody, the manager of the Elevators company, also dealt with the Turner-Hudnut Company through its futures department. The transactions in futures were not recorded in the books of the Elevators company, but the statements rendered by the Turner-Hudnut Company concerning them were kept by Lightbody in the files of his office. No money was paid on account of any of these transactions, and according to the books of the Turner-Hudnut Company they resulted in a loss of $7450.91 by the Elevators company. This sum was set off against the claim of the Elevators company for grain sold and delivered.

The *prima facie* case of the Elevators company was limited to showing the balance due and unpaid on the cash

grain account. The defense showed that Lightbody, prior to July 1, 1920, had directed the secretary of the Turner-Hudnut Company to transfer the balance due the Elevators company on the cash grain account to the futures account, and that the transfer was made in accordance with Lightbody's instructions; that subsequently the Turner-Hudnut Company received a letter from the Elevators company, dated November 17, 1920, which stated that there remained due the latter a balance of $538.32, and that on the next day the Turner-Hudnut Company answered the letter and remitted the sum claimed by check. The two letters and the check showing payment were introduced in evidence. On rebuttal the Elevators company introduced sixteen statements of transactions in futures rendered it by the Turner-Hudnut Company. These statements showed purchases aggregating 168,000 bushels of corn and 10,000 bushels of oats, and sales aggregating 183,000 bushels of corn and 10,000 bushels of oats. None of the grain so bought or sold was received or delivered, and Lightbody testified that these transactions were speculative, and that the receipt or delivery of grain was not intended by either party in any of these transactions. A letter from the Turner-Hudnut Company to the Elevators company dated November 3, 1919, requesting the latter's check for $3000 "to margin your open trades with us," was also admitted. On sur-rebuttal, Thomas O'Loughlin, manager of the futures department of the Turner-Hudnut Company, testified that it was his impression when orders were received from Lightbody that the Elevators company had the grain and that it was to be delivered. He admitted, however, that as a rule transactions in his department were settled on margins. He also testified that the commission houses in Chicago which acted for the Turner-Hudnut Company did not know that they were executing orders for the Elevators company. The Turner-Hudnut Company called George B. Hornish, its secretary, to testify that during the time the transactions

in futures were carried on he had a conversation with Light-body in which the latter said that the Elevators company had a large quantity of grain in its Bell Landing elevator which could not be shipped because the river was frozen over, and that he, Lightbody, was selling this grain for future delivery in order to obtain the prevailing high prices. Upon objection this testimony was excluded. It further offered the by-laws, rules and regulations of the Chicago Board of Trade to show that the purchases and sales made by the Elevators company through the Turner-Hudnut Company's futures department were made in accordance with those by-laws, rules and regulations, but they also were excluded.

Plaintiff in error, the Turner-Hudnut Company, contends that the trial court erred (1) in sustaining the demurrer to its second rejoinder; (2) in excluding the testimony of George B. Hornish, its secretary, concerning his conversation with Lightbody; and (3) in excluding the by-laws, rules and regulations of the Chicago Board of Trade.

Section 130 of the Criminal Code (Cahill's Stat. 1925, p. 872,) provides that whoever contracts to have or give to himself or another the option to sell or buy at a future time any grain or other commodity, where it is at the time of making such contract intended by both parties thereto that the option, whenever exercised, or the contract resulting therefrom, shall be settled not by the receipt or delivery of such property but by the payment only of differences in prices thereof, shall be fined, or confined in the county jail, or both, and all contracts made in violation of the section shall be considered gambling contracts and shall be void. Section 131 of the same code provides that all promises, contracts or agreements entered into where the whole or any part of the consideration shall be for any money, property or other valuable thing won by any gaming, shall be void and of no effect. By the 132d section of the Criminal Code the loser may commence an action within six

months for the recovery of the money which he lost at gambling.

All transactions in grain or other commodities are gambling transactions within the meaning of section 130 of the Criminal Code and are void if it was the understanding between the parties that no deliveries were to be actually made but that the purchases or sales were to be adjusted by the mere settlement of the differences in prices. (*Pratt & Co.* v. *Ashmore,* 224 Ill. 587; *Pope* v. *Hanke,* 155 id. 617; *Schneider* v. *Turner,* 130 id. 28.) The first rejoinder raised the issue whether or not the contracts in futures constituted gambling transactions. Both the trial and Appellate Courts found that, so far as the transactions in futures were concerned, neither party intended that there should be the receipt or delivery of any of the grain bought or sold; that both parties understood that settlement would be made only by the payment of differences, and that these purchases and sales constituted gambling transactions and were void. That issue of fact was conclusively settled when the judgment of the trial court was affirmed by the Appellate Court. The accounting and settlement averred in the second rejoinder admittedly were made by setting off the losses which arose out of the gambling contracts against a balance due and owing for grain actually sold and delivered. A claim which is void by reason of its illegality will not support an account stated or payment by or through some other medium. (*Wakefield* v. *Farnum,* 170 Mass. 422; *Melchoir* v. *McCarty,* 31 Wis. 252; *Thomas* v. *First Nat. Bank,* 213 Ill. 261; *Chapin* v. *Dake,* 57 id. 295; 1 Corpus Juris, 701.) The defense sought to be interposed by the second rejoinder could not, therefore, avail the plaintiff in error, and section 132 of the Criminal Code has no application. That section applies where the moving party seeks to recover money which he lost at gaming and allows him six months within which to institute his action. The instant suit was not brought to collect money thus lost but to recover an in-

debtedness which arose out of the sale and actual delivery of grain. Statutes of limitation are restrictive and will not be extended to cases other than those for which express provision is made. (*Helbig* v. *Citizens' Ins. Co.* 234 Ill. 251; *Bedell* v. *Janney,* 4 Gilm. 193.) It follows that the trial court did not err in sustaining the demurrer to the second rejoinder.

Complaint is made by the plaintiff in error of the exclusion of the testimony of George B. Hornish, its secretary. The excluded testimony had reference to a single conversation with Lightbody, in which the latter said that the defendant in error had a large quantity of grain in its elevator at Bell Landing which, because the river was frozen over, could not be shipped, and that he, Lightbody, was selling this grain for future delivery in order that the current high prices might be obtained. The transactions in futures continued through a considerable period, both before and after the frozen river made it impossible to ship from the elevator at Bell Landing. The capacity of that elevator was approximately 20,000 bushels, while the statements rendered by the plaintiff in error show that the gambling transactions involved the sale by the defendant in error of 193,000 bushels of grain, and none of this grain, it is admitted, was ever delivered. The relevancy of the offered testimony to the issue raised by the first rejoinder is not apparent and the testimony was properly excluded.

It was sought to introduce in evidence the by-laws, rules and regulations of the Chicago Board of Trade to show that they provided for the delivery of the grain bought and sold on that board. The statements of the transactions in futures rendered by the plaintiff in error and admitted in evidence set forth that the delivery of the grain bought and sold was contemplated. Yet it was intended both by the plaintiff in error and the Elevators company that in these transactions no grain was to be delivered, and, as their result, none was ever delivered. The provisions of the by-

laws, rules and regulations of the Chicago Board of Trade were therefore immaterial and the trial court did not err in excluding them.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*