John FACTOR, Plaintiff-Appellant,

v.

CARSON, PIRIE SCOTT & COMPANY, Kroch's & Brentano's, Inc., The Fair, Illinois corporations, and Ray Brennan, Defendants-Appellees.

No. 16000.

United States Court of Appeals Seventh Circuit.

March 13, 1968.

Rehearing Denied May 10, 1968, en banc.

Knoch, Senior Circuit Judge, dissented.

Albert E. Jenner, Jr., Keith F. Bode, Robert E. Pfaff, Philip W. Tone, Chicago, Ill., for plaintiff-appellant, Ray-

mond, Mayer, Jenner & Block, Chicago, Ill., of counsel.

Howard P. Robinson, George W. Mc-Burney, Arthur F. Staubitz, Chicago, Ill., for defendant-appellee, Carson, Pirie Scott & Co.; Sidley & Austin, Chicago, Ill., of counsel.

Narcisse A. Brown, William F. McNally, Chicago, Ill., for defendant-appellee, The Fair.

Eloise Johnstone, Chicago, Ill., for defendant-appellee, Ray Brennan.

Jack Edward Dwork, Chicago, Ill., for defendant-appellee, Kroch's & Brentano's, Inc.

Before SCHNACKENBERG, Circuit Judge, KNOCH, Senior Circuit Judge, and SWYGERT, Circuit Judge.

SCHNACKENBERG, Circuit Judge.

John Factor, plaintiff, a resident of California, has appealed from a judgment of the district court dismissing, on the authority of an Illinois statute of limitations,[1] his suit for libel and invasion of privacy, refiled in 1965.

The litigation is a result of the publication and sale of a book entitled "The Stolen Years" which plaintiff's counsel describe as a partially ghost-written autobiography of one Roger Touhy. Plaintiff maintains that the book charges him with perpetrating "one of the biggest swindles of its kind in history", and that, in addition, its principal theme is that plaintiff was guilty of perjury and conspiracy to obstruct justice, in connection with the conviction of Touhy for the kidnaping of plaintiff in the 1930's. Defendants moved to dismiss the suit on a number of grounds, including the statute of limitations.

An earlier suit on the same grounds as the instant action had been filed by plaintiff in the court below in December 1959.[2] The named defendants were and are citizens of Illinois although plaintiff alleged he was then a British subject. Touhy was a defendant in the 1959 case until his death. In that case jurisdiction was based on 28 U.S.C.A. § 1332(a) (2), which confers jurisdiction upon district courts in civil actions between citizens of a state and citizens or subjects of a foreign state.

When defendants moved to dismiss the 1959 action for lack of jurisdiction, contending that plaintiff, an alien, was not a citizen of Great Britain, the district court denied the motion. 230 F.Supp. 906 (Dec. 30, 1963). Following a subsequent trial on the issue of jurisdiction, the district court on December 23, 1964 dismissed the 1959 case on the ground that plaintiff failed to sustain his burden of proof of the existence of jurisdictional facts. The court's view of the evidence was that it tended to prove that plaintiff was born in Russian Poland rather than in Great Britain, and that, under the court's interpretation of Russian law, plaintiff was, at the time of filing of that action, a stateless person and so not able to invoke a federal court's jurisdiction under the alienage provision. See 238 F. Supp. 630. The court stated the action was dismissed *with prejudice*.[3]

On September 16, 1965, plaintiff refiled his suit which is the instant action, 65 C 1558. It is undisputed that plaintiff had become an American citizen in 1963 and was a resident of California. His counsel now insist that the jurisdictional defect which caused the dismissal of the 1959 action now constitutes no impediment to the 1965 action and that, in fact, federal jurisdiction exists in this action on the basis of diversity of citizenship.

It is undisputed that the 1959 action had been commenced within the one-year limitation period prescribed by Illinois law for actions to recover damages for libel and for the invasion of a right of

---

1. § 24a, Ch. 83, Ill.Rev.Stat.1965.

2. Factor v. Pennington Press, Inc., et al. (59 C 1961).

3. But it is now contended by plaintiff's counsel and not denied that, under rule 41(b) of the Federal Rules of Civil Procedure, a dismissal solely on jurisdictional grounds could not be an adjudication on the merits.

privacy. Plaintiff's counsel argue that, when that action was nonsuited, the right to refile was governed by § 24a of the Illinois Limitations Act, which provides:

§ 24a In any of the actions specified in any of the sections of this act or any other act or in any contract where the time of commencement of any action is limited, if judgment shall be given for the plaintiff, and the same be reversed upon appeal; or if a verdict pass for the plaintiff, and, upon matter alleged in arrest of judgment, the judgment be given against the plaintiff; or, if the plaintiff has heretofore been nonsuited or shall be nonsuited then, if the time limited for bringing such action shall have expired during the pendency of such suit, the plaintiff, his or her heirs, executors, or administrators, as the case shall require, may commence a new action within one year after such judgment reversed or given against the plaintiff, and not after.

Thus plaintiff contends that the one-year limitation period for the libel suit ended during the pendency of the 1959 action, that the dismissal of that action for lack of jurisdiction constituted a "nonsuit" under § 24a,[4] and that the case at bar had been filed within the one-year period after dismissal of the 1959 action. Plaintiff insists he meets every requirement expressed in § 24a. However the district court held that plaintiff's action would be barred by the limitations unless he could show that he had acted in good faith in the 1959 action, which meant, according to that court, that plaintiff must have believed, *in good faith*, that he was born in Great Britain, when he prosecuted that action.

The court then determined the "good faith" issue against plaintiff, on the basis of the trial on the issue of jurisdiction of the 1959 action, and dismissed the 1965 action. However, on plaintiff's motion to vacate that dismissal, the court consented to receive evidence and on May 27, 1966 did hold a hearing, but, over plaintiff's objection, imposed upon *him* the burden of *disproving defendants' charges of bad faith* in connection with the 1959 action. The court received the oral testimony of witnesses in court, as well as certain depositions and a number of exhibits produced by plaintiff, all of which we condense as follows:

Plaintiff's sister, Dena Lupu, a housewife, aged 76 years, living in Los Angeles, California, by deposition, testified her mother's name was Leah Factor and her father's name was Abraham Joseph Factor, both deceased; that she was born in Lodz, Russia-Poland, that she and plaintiff, her brother, came from there to the United States with their parents; that plaintiff when he came to the United States, spoke Jewish; that he was about two years younger than she; that at their home her parents told her that her brother John was born in England; that they never told her John was born any other place than England.

Ted Factor, plaintiff's nephew, testified by deposition that in 1924 or 1925 in his parents' home in Chicago, when he was about nine or ten years old, his father who was about to go on a visit to Europe told him he was going to visit a brother in Hull, England, and that Ted's father stated Hull was the birthplace of John Factor, plaintiff here.

Ted Factor also recalled that other members of the family gave him the same information on other occasions, but that neither his father nor his uncle (plaintiff here) had ever told him the latter was born any place other than Hull, England.

Monte Factor, by deposition, testified that he is a nephew of plaintiff and also a son of Nathan Factor; that in his parents' home in St. Louis, prior to 1924 and in Chicago, and Oakland and Los Angeles, California, in 1924

---

4. Plaintiff cites Roth v. Northern Assurance Co. Ltd., 32 Ill.2d 40, 203 N.E.2d 415, 16 A.L.R. 3d 442 (1964).

and 1925, he heard both of his parents state that his uncle, John Factor, was born in England. He never heard his parents say that John was born at any other place.

Jerome Factor testified that he is plaintiff's son, that his parents were divorced about 1917, and that he has had frequent contacts over the years with plaintiff; that between 1930 and 1933 he and plaintiff were looking through a box and came upon plaintiff's British passport, whereupon plaintiff said that he was a British subject and was born in Hull, England. Further, Jerome testified that about 1924 he had a conversation with his uncle, Nathan Factor, in his St. Louis home in the presence of the latter's wife, Rose, and their sons, Ted and Monte, when Nathan Factor stated that plaintiff had been born in Hull, England, and he was the only member of the Factor family born any place other than Russia-Poland; that plaintiff's father and mother had been in Hull at the time of plaintiff's birth and that after plaintiff's birth plaintiff had been taken back to Poland

Jerome also recalled that about 1926 he talked with plaintiff's sister, "Aunt Gussie", at her store on Roosevelt Road in Chicago, when she stated that plaintiff was born in England.

Retired Chicago attorney George Gale Gilbert, Jr., testified he met plaintiff in 1928 when he came to Gilbert for the purpose of making a will. Under Gilbert's questions, indicating the importance of the information he sought, plaintiff informed him that he was a British subject and that he was born in Hull, England. He produced a British passport which indicated that he had obtained it by representing that he was born in Hull, England.

Mr. Gilbert testified that he represented plaintiff in the federal district court in Chicago in the case of Faber, et al., v. Foreman Trust and Savings Bank, No. 10538, in the course of which he made an investigation concerning plaintiff's place of birth. This investigation included a discussion with plaintiff, three of his brothers, an examination of immigration records, and a further interview with a brother and with plaintiff. Gilbert named several of these relatives. Also in 1932 he interviewed plaintiff's brother, Max Factor, who was deceased at the time Mr. Gilbert testified, and from Max he got the family history including the fact that plaintiff was born in Hull, England, of a rabbi father and his wife, while sojourning there, the details of which were set forth in Max's affidavit, hereinafter described.

John Factor, who was present at this interview, told Gilbert that he always believed that he had been born in Hull, England, that it was the family tradition in relation to his birth that he had heard several times. Rella Factor, wife of plaintiff, was in the room during the conversation.

Mr. Gilbert further testified that he recognized the signature "Max Factor" on the affidavit dated February 26, 1932, marked plaintiff's exhibit 1 and that it was so signed in his presence and that he (the witness) notarized it and also was familiar with its contents.

Mr. Gilbert also testified that he prepared an affidavit (plaintiff's exhibit 2), dated March 8, 1932 which was executed by Max Factor following an interview with him in Gilbert's office. Gilbert had interviewed Max Factor in the presence of John Factor and a secretary, during which the place of birth of plaintiff was discussed.

Gilbert further testified that Max told him again in greater detail of the family history of the birth of John in Hull, England, that he made a memorandum thereof, and that the affidavit contains the substance of what Max told him.

The witness [Gilbert] added that plaintiff looked over the affidavit and said something like "that is what I always thought".

So during 1932 the persons interviewed included John Factor, Max Factor, Daniel Factor and Nathan Factor. On these occasions both Nathan and Daniel also executed sworn affidavits. These affiants in detail stated that their father and mother, in 1892, left the home in Lodz, Poland, for a trip through Europe, in the latter part of that year returning to Lodz with a newborn child called John Factor, who was born in Hull, England. Neither Daniel nor Nathan was alive at the time Gilbert testified.

Plaintiff's testimony at the hearings in the 1959 and 1965 actions included the following:

He is the son of Abraham Joseph Factor, a rabbi, and Leah Factor, and spent his childhood in or near Lodz, Russian Poland; that he, his parents and sister Dena emigrated to the United States in 1905 or 1906. Until 1918 or 1919 he had assumed, without being told, that like his brothers and sisters, he had been born in or around Lodz.

In 1917 he made application to become a naturalized citizen of the United States, stating in the application that he was born in Russia; that shortly thereafter he informed his parents about the naturalization application and the statement therein regarding his place of birth; that then for the first time his parents informed him that the information he used on the application was incorrect, that he had been born in Hull, England, while the parents were on a visit there. As a result, plaintiff stated he took no further action with respect to his application for citizenship; that since

this conversation he has continuously believed in good faith that he was a citizen of Great Britain by reason of birth there; that this belief was based, not only upon the aforementioned conversation with his parents, but upon later conversations with his parents, older half-brothers Max and Daniel, and his elder brother Nathan; that in all conversations with his father and mother they always stated that he was born in Hull, England. That all of his immediate family, except his brother Frank Factor, and his sister Dena Lupu, were deceased at the times of the hearings; that Frank, about five years older than he, was very ill.

That in the 1920's he made an investigation concerning his birthplace, asking a brother Bernard, living in Hull, England, to attempt to find proof of where plaintiff was born, and that in 1928 Bernard sent him a letter to the effect that "Enclosed you will find this document which I received from Mr. Schultz. He was at your circumcision."; that the enclosure [plaintiff's exhibit 9] is an affidavit of Solomon Schultz, dated March 23, 1928, at Kingston-upon-Hull, England.

Plaintiff testified that the customs of the orthodox Jewish faith require that infant boys be circumcised seven days after birth.[5]

Plaintiff testified further that:

During the course of his investigation in the 1920's regarding circumstances surrounding his birth, he obtained an affidavit [plaintiff's exhibit 10] [6] from his mother, while has since been in his possession for many years.

5. Affiant Schultz states in said affidavit that he at the time of said affidavit, was a tailor, 65 years of age, that Kingston-upon-Hull, England had been his residence for 64 years; that he remembered being present at a circumcision by Mr. Pearlson, a Jewish clergyman, performed in that city in a house in Upper Union Street, upon a child Jacob Factor, whose father was a traveling preacher Abraham

Joseph Factor; that he remembered the incident definitely as the father had given an address the previous Saturday in the synagogue at Robinson Row, in Kingston-upon-Hull, that the date of this circumcision was about 1892.

6. Affidavit bears date of August 2, 1924, stating affiant's son, John Factor, was born at Hull, England, is executed by Le-

Plaintiff identified his passport issued in Canada in 1923 [plaintiff's exhibit 14] which describes him as a British subject and states he was born in Hull, England. He also testified that when he filed, on October 21, 1959, his petition for naturalization as an American citizen, he stated therein that he was born in Hull, England. Records of the United States District Court for the Southern District of California in case No. 217,-599, corroborate plaintiff in that respect.

Defendants rested solely upon the transcript and exhibits introduced at the trial of the jurisdictional issue in the 1959 action.

Defendants, in their brief, cite, plaintiff's testimony in the 1959 case that in an affidavit he had stated his parents sojourned in England for two or three months and that his birth occurred on October 8, 1892 in Hull, England. Defendants also introduced in evidence the manifest sheet of the S.S. Haverford landing at Philadelphia, Pennsylvania in March, 1906, on which plaintiff, his parents and sister came to this country, showing plaintiff's age as "eleven" and his nationality as Russian. That manifest sheet listed thirty names, with twenty-two printed column headings, on the first line of which opposite the first name in the column headed "Nationality" appeared the word "Russia". In that column underneath on each line of the sheet appeared a checkmark opposite each of twenty-nine names indicating each was from "Russia".

The record shows that plaintiff explained the discrepancy in his testimony about his age by admitting he "could not remember things that occurred that long ago" and that "these are discrepancies that are through the history of our family, because we had no birth certificates." Defense counsel attempted to impeach plaintiff as a witness by also calling his attention to statements about the date and place of his birth in connection with his application for a barber's license, his

declaration of intent to become a naturalized citizen of the United States, the procuring of a Selective Service registration card in 1917, a birth certificate for his son Alvin, and his statement in 1925, when applying for a marriage license for his second marriage, that he was born in Chicago. In explanation, plaintiff testified frankly that he was in England when the son Alvin was born and did *not* furnish the information contained in the son's birth certificate; likewise that he listed Chicago as his birthplace because he feared that the revelation of his alien status might hinder or delay his marriage.

Defendants introduced their exhibit 14, an opinion by District Judge Woodward of the United States District Court in Chicago, dated March 5, 1932, in the case of Faber v. Foreman Trust & Savings Bank, No. 10538 in said court, denying a motion of John Factor and Rella Cohen Factor to reconsider their prior motion to dismiss the amended complaint in that action on jurisdictional grounds, which had been denied by Judge Wilkerson. Defendants' exhibit 15 is a verified motion by defendant Arthur L. Schwartz to dismiss the said amended complaint for want of jurisdiction, while defendants' exhibits 9 and 10 are copies of the decree and of findings of fact and conclusions of law entered in the *Faber* case September 29, 1932. There is a recital in defendants' exhibit 10 that John Factor is a citizen and resident of Illinois. Finally, defendants introduced documents showing the indictment, conviction and sentence in 1942–1943 of plaintiff for mail fraud.

Thereupon the trial court in the 1965 case on October 20, 1966 entered findings and concluded that the plaintiff had not shown good faith in claiming in the 1959 case that he was born in Hull, England, and held that his claims were barred by limitations. It dismissed the complaint with prejudice. Although estoppel had not been pleaded, the court

ah Factor by her mark, notarized by Rose Factor. Monte Factor, Rose Factor's

son, testified that the signature is that of his deceased mother.

said that plaintiff "should be estopped" from relying on § 24a.

■ 1. The question of whether plaintiff was entitled to take advantage of the right, bestowed by § 24a, to refile his action, and, if so, under what conditions, was settled by the Illinois legislature when it enacted § 24a. The language of the act is precise. It is complete. These facts require the rejection of any additional requirement which a court might seek to impose. It was the duty of the district court to apply § 24a as enacted.

In Roth v. Northern Assurance Co., Ltd., 32 Ill.2d 40, 48, 203 N.E.2d 415, 419, 16 A.L.R.3d 442 (1964), the court said:

"* * * *The plain purpose of section 24* is to facilitate the disposition of litigation upon the merits and *to avoid its frustration upon grounds that are unrelated to the merits*. No reason is suggested why this purpose is not just as applicable to a short contractual limitation as it is to the longer statutory period. In neither case is any injury inflicted upon the defendant, who must have knowledge of the claim asserted against it within the time provided by statute or contract, before the provision for the new action becomes operative. * * *"
(Emphasis supplied.)

and at 49, 203 N.E.2d at 420, the court added:

"* * * 'Statutes of limitation, like other statutes, must be construed in the light of their objectives. The basic policy of such statutes is to afford a defendant a fair opportunity to investigate the circumstances upon which liability against him is predicated while the facts are accessible. That purpose has been fully served here. As observed by Mr. Justice Holmes in New York Central & H. R. Railroad v. Kinney, 260 U.S. 340, 342, 43 S.Ct. 122, 67 L.Ed. 294, "Of course an argument can be made on the other side, but when a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and we are of opinion that a liberal rule should be applied."' Geneva Construction Co. v. Martin Transfer and Storage Co., 4 Ill.2d 273, 289–290, 122 N.E.2d 540, 549."

In White v. Turner-Hudnut Co., 322 Ill. 133, 140, 152 N.E. 572 (1926), the court said:

"* * * Statutes of limitation are restrictive and will not be extended to cases other than those for which express provision is made. * * *"

■ The words of the statute of Illinois are unambiguous. However, in the case at bar, the district court in effect wrote into § 24a a limitation which the general assembly did not insert nor the Illinois Supreme Court has ever applied. The district court would withhold the benefit of the statute until plaintiff proved his good faith with respect to the allegations in the complaint which he had filed in the nonsuited action. We have been cited to no decision of any federal court or of any Illinois court which has superimposed this burden upon one who seeks to take advantage of § 24a. This is not surprising, because the right to plead the defense of limitation of an action has always been recognized by courts of law. Usually it is embodied in statutes, in which case the success of such defense depends upon the provisions of the statute itself, not to a judicial modification thereof. Section 24a is an additonal statutory device, the use of which merely postpones the effectiveness of the intervening bar of a statute of limitations where a suit, filed seasonably, has been nonsuited. Where § 24a operates, it effects an extension of the time allowed for suing on the original cause of action. Therefore the new suit *so filed is subject to* defenses on the merits in the same way as was the first suit filed. We find no basis in law for holding that a plaintiff's reliance upon § 24a *ipso facto* creates an issue of his good faith in doing so. We shrink from the

proposition that conformity to a state statute creates a presumption of bad faith.

There is no contention here, nor was there in the court below, that the equitable doctrine of laches bars plaintiff's action.

In Lamson v. Hutchings, 7 Cir., 118 F. 321 (1902),[7] we discussed 2 Starr & Curtiss Ann. St., p. 2642, c. 83, par. 25, which was the forerunner of the present § 24a. In an earlier appeal[8] this court had ruled that the case there involved was governed by the Illinois five-year statute of limitations. That suit was dismissed on February 4, 1897 and a new suit was commenced within one year thereafter. Par. 25 provided:

"In any of the actions specified in any of the sections of said act, * * * if the plaintiff be nonsuited, then, if the time limited for bringing such action shall have expired during the pendency of such suit, the said plaintiff, * * * may commence a new action within one year after such judgment * * * given against the plaintiff, and not after."

At 323, this court said:

" * * * By that same token we think that this statute of Illinois, which seeks to relieve the diligent but mistaken claimant from the consequences of his mistake, should receive a like liberal interpretation in the interests of justice and of fair play. * * *"

At 324, we continued:

" * * * The intent of the statute was that the time occupied in an unsuccessful litigation touching a demand—the statutory limitation expiring during the litigation—should not prove a bar, where the merits of the controversy had not been determined, but that a period of one year should be allowed after the expiration of the unsuccessful litigation to bring a proper action to enforce the demand; and this whether the unsuccessful litigation be at law or in equity. The legislature was not dealing with form merely, but with substance, to relieve from mistaken proceedings. * * *"

Accordingly this court affirmed the judgment against defendants entered by the district court.

It is significant that in the *Lamson* case, neither court nor counsel deemed worthy of mention the "good faith" of either litigant which, if it were relevant, could be injected to harass plaintiff in every case involving § 24a. We still believe that our views in *Lamson* are sound and that there can be no justification for the action of the district court in virtually amending § 24a by adding the words "good faith" and thus legislating a broad exception to § 24a. We think it significant that, likewise in *Roth,* ante, page 10, there is an absence of any inquiry into or judicial interest in plaintiff's good faith with respect to the filing of the prior action.

But on this point, defendants herein rely on Tidwell v. Smith, 57 Ill.App.2d 271, 273–274, 205 N.E.2d 484, 486 (2d Dist., 1965). However, in *Tidwell* the plaintiff attempted to use § 24a after his self-initiated delay, which the court held constituted a virtual abandonment of his cause of action, rather than for the purpose of affording a fair opportunity to try the case on the merits, which is unlike the situation in the case at bar.

In Sachs v. Ohio Nat. Life Ins. Co., 7 Cir., 131 F.2d 134 (1942), we emphasized the liberal construction to be given to § 24a. The opinion of this court shows that it was concerned with the question of whether the word "nonsuit" included "dismissal for want of jurisdiction of the amended and supplemental complaint filed in the former suit" and so was a "nonsuit" within the meaning of § 24a.

---

**7.** Cert. denied 189 U.S. 514, 23 S.Ct. 853, 47 L.Ed. 924 (1903).

**8.** Hutchings v. Lamson, 7 Cir., 96 F. 720 (1899).

No issue of good faith was before the court. Although, at 137, we said,

> "The act is remedial, reflecting a legislative intent to protect the party who brings the action in good faith from complete loss of relief on the merits merely because of a procedural defect. * * * *",

obviously the words "good faith" are *obiter dictum*.

2. The fundamental question now is whether there was in the evidence in the record before the district court a sufficient basis for a reasonable belief by plaintiff that he was born in Hull, England.

In brief, the Factor family in 1892 was living in Russia, but plaintiff's birth occurred while his rabbi father and mother were then on a temporary sojourn in England. Defendants seek to raise a doubt by pointing to a routine entry made by a crewman on an Atlantic Ocean vessel's manifest in 1906 which would indicate plaintiff's age as 14 years when considered with his claimed birth date of 1892, rather than the 11 years shown thereon, and that the manifest listed plaintiff, his father, mother and a sister as "Russians".

On the other hand, plaintiff's exhibit 9 is an affidavit by Solomon Schultz, which he executed on March 23, 1928 before a commissioner in the Supreme Court of Judicature in England. Therein Schultz swore that he had been a resident of Hull, England, "for the past 64 years" and that he was present about 1892 when a Jewish clergyman named E. Pearlson at a house (the location of which he stated) in Hull, England, performed a circumcision on a child named Jacob Factor,[9] whose father was a traveling preacher named Abraham Joseph Factor; that he was able to speak "so definitely" because "of the unfamiliar name and the father of the child being a preacher who gave an address the pre-

vious Saturday in the synagogue in Kingston-upon-Hull aforesaid".

In 1892 Rabbi Factor took his pregnant wife to England. In the city of Hull he participated in the religious service at the Jewish synagogue. In that city the child of this pregnancy, named Jacob, was born to the Factors and was circumcised a few days later, according to the ritual of the Jewish faith. Thus started the life of plaintiff.

General conditions in Europe, both before and after that time, contributed to heavy immigration of Jewish people from Europe to the United States. In the decade of 1871–1880, 73.6% of immigrants to the United States came from nothern and western Europe, and *only* 7.2% from southern and *eastern* Europe, and the figures for the decade 1891–1900 show that the immigrants to the United States from northern and western Europe were 44.6% and those from southern and *eastern* Europe were 51.9%. But, in the following decade, 1901–1910, immigrants to the United States from northern and western Europe comprised only 21.7% while those originating in southern and *eastern* Europe were *70.8%*. 8 U.S.C.A. 1, 12 (1953).

Thus, when plaintiff with his parents and sister Dena arrived at Philadelphia in 1906, the so-called "new immigration", largely coming from Russia as a result of Czarist persecution of the Jews, was at its height.

While it might have appeared superficially that plaintiff and his family were traveling by ship to the United States as part of a great migrating wave composed of *Russian* citizens, the undisputed fact that he was born in England had made him a British national.

In determining his status, the law in the United States recognizes the principle that a person's citizenship may be based upon his place of birth. Thus, plaintiff's naturalization in the United States by an order of the United States

---

9. Jacob and John are used interchangeably for plaintiff in the record in this case.

District Court for the Southern District of California, entered July 15, 1963 recognized that he had been a national of England by virtue of his birth at Hull, England, on October 8, 1892.

3. Defendants' counsel offered in evidence exhibits 14 and 15, which are an opinion by Judge Charles E. Woodward of the United States District Court at Chicago, Illinois, and the verified motion of a defendant, Arthur L. Schwartz, to dismiss the second amended complaint in the *Faber* case, ante, page 5. However, we note that here (1) all of the testimony of various witnesses for plaintiff Factor (either personally, by deposition or by affidavit) was before the district court from which the present appeal has been taken, (2) this court's determination of this appeal is based upon all of said evidence, but (3) only parts of that evidence were before Judge Wilkerson and Judge Woodward.

■ 4. Although the district court, from which the appeal in the present case was taken, imputed bad faith to the plaintiff in his assertion of his birth in England, the cumulation of facts established by the evidence, as hereinbefore set forth in this opinion, pointing to the birth of plaintiff at Hull, England, the evidence of family repute by the testimony of attorney Gilbert, and depositions and affidavits of numerous relatives of plaintiff, all lead to an inescapable conclusion that plaintiff could have justifiably believed that he was born in England in 1892. The correctness of this factual result is emphasized by the statement which plaintiff made to his attorney in 1928 when plaintiff consulted him for the purpose of making a will. On such an occasion a man would ordinarily have no conceivable purpose for concealing the place of his birth. Plaintiff then showed him a British passport, which he had just obtained and which showed that he had been born in Hull, England. Also in evidence as plaintiff's exhibit 14 is a Canadian passport issued January 2, 1923 to plaintiff, therein described as a "British subject."

Actually we must realistically face a situation where, in order to sustain the district court's findings herein, it would be necessary for us, not merely to disregard the mass of evidence in this record tending to support plaintiff's contention, but also to implicitly conclude that the witnesses and affiants, by which such evidence has been established, are unworthy of belief, either because of perjury or an amazing incapacity to remember important matters of family pedigree.

■ As to plaintiff being estopped in this case, it should be noted that rule 8 of the Federal Rules of Civil Procedure provides that the defense of estoppel must be set up in a pleading. There is no such pleading on file in this case.

■ For these reasons the judgment of the district court is reversed and this cause is remanded to that court for a trial on the merits in accordance with the views herein expressed.

Reversed and remanded with directions.

KNOCH, Senior Circuit Judge (dissenting).

It seems to me that the statute in question is designed to benefit those who make honest mistakes of law or fact and that the District Court did not err in considering the element of good faith. Nor does it seem to me that the burden of proving good faith was imposed on the plaintiff but merely the burden of carrying on with evidence at the hearing after a prima facie allegation of facts to show lack of good faith. While there is a conflict in the evidence, I do not believe that we can conclude that the District Court was clearly erroneous in its findings of fact. I would affirm the order of dismissal.